**In re NextWAVE PERSONAL COMMUNICATIONS, INC., et al., Debtors.**

**NextWave Personal Communications, Inc., Plaintiff–Appellee,**

v.

**Federal Communications Commission, Defendant–Appellant.**

Nos. 99 Civ. 4439(CLB).
Bankruptcy No. 98 B 21529(ASH).
Adversary No. 98–5178A.

United States District Court,
S.D. New York.

July 27, 1999.

Deborah Schrier–Rape, Andres & Kurth, Dallas, TX, for NextWave Personal Communications, Inc.

Daniel S. Alter, Mary Jo White, New York City, for Federal Communications Commission.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

This appeal challenges five decisions and orders of the Bankruptcy Court, issued in a Chapter 11 Proceeding by the Honorable Adlai S. Hardin, United States Bankruptcy Judge, dated December 7, 1998, February 16, 1999, April 2, 1999, May 12, 1999 as supplemented on June 22, 1999, and June 16, 1999, rendered in the Adversary Proceeding of NextWave Personal Communications, Inc. ("NextWave") against the Federal Communications Commission (the "FCC") (the "Adversary Proceeding"). On June 22, 1999, Defendant–Appellant FCC filed its brief; on July 2, 1999, Plaintiff–Appellee NextWave filed its brief; and on July 8, 1999, the FCC filed its reply brief. On July 15, 1999, this Court heard oral argument on the appeal and reserved decision. Thereafter, on July 20, 1999, NextWave submitted a letter brief addressing certain concerns raised by the Court at oral argument.

Familiarity of the reader with the decisions of Judge Hardin is assumed.

█ In an appeal of a Bankruptcy Court's decision and order, this Court reviews findings of fact for clear error, *see In re Artha Management, Inc.*, 91 F.3d 326, 328 (2d Cir.1996), and conclusions of law *de novo, see In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 89 (2d Cir.1992).

## FACTUAL BACKGROUND

The facts relevant to this appeal are not disputed significantly. In 1993, after investigation and discussion, the House Committee on Energy and Commerce (the "Committee"), concluded

> that a carefully designed system to obtain competitive bids from competing qualified applicants [for electromagnetic spectrum licenses] can speed delivery of services, promote efficient and intensive use of the electromagnetic spectrum, prevent unjust enrichment, and produce revenues to compensate the public for the use of public airwaves.

H.R.Rep. No. 103–111 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378, 580. In response, Congress passed the 1993 amendments to the Federal Communications Act (the "FCA"), which added section 309(j). *See* 47 U.S.C. § 309(j). Section 309(j) granted the FCC the power to conduct competitive bidding auctions to sell the right to apply for "blocks" of airspace or radiobands. As part of the program, the FCC was to designate certain blocks for auction to small, emerging businesses and to provide flexible, deferred payment plans to such small businesses. *See* 47 U.S.C. § 309(j)(3)(B) and (4)(D). Pursuant to Congress' mandate, the FCC created a competitive bidding auction system and designated the "C Block" for auction to small businesses providing Personal Communication Services ("PCS"), a new form of wireless communication technology. Maximizing revenue was proscribed explicitly as an objective of such system.

On May 6 and July 16, 1996, the FCC ran auctions for C Block licenses at which NextWave won the right to apply for sixty-three C Block licenses by bidding $4.7 billion. NextWave put down the required deposit of $474 million (10% of the winning bid) and proposed a payment plan at below-market interest rates for the remaining $4.26 billion. NextWave submitted applications for the licenses for review and approval by the FCC. On January 3, 1997, the FCC approved NextWave's applications and soon thereafter sent to NextWave a series of promissory notes for a

total of $4.26 billion, dated January 3, 1997. NextWave executed the notes on February 19, 1997.

Before approving the C Block licenses for NextWave, the FCC conducted auctions for "D, E & F Block" licenses, resulting in much lower bids for the rights to apply for the same or similar licenses. As a consequence of the gross disparity between the bids on the C Block licenses and on the D, E and F Block licenses, 90% of the winning bidders from the C Block auction were unable to obtain financing for their payment plans. The FCC thereafter promulgated voluntarily two restructuring orders (the "Restructuring Orders") that offered the C Block license-holders four options to restructure their debt. NextWave informed the FCC that the four options were not commercially viable and on May 8, 1998, requested an alternative restructuring. The FCC refused and NextWave appealed that decision to the Circuit Court of Appeals of the District of Columbia and requested a stay of the June 8, 1998 deadline to elect one of the four options. The Court of Appeals denied the request for a stay.

On June 8, 1998, NextWave, unable to finance its enormous debt to the FCC and severely undercapitalized, declared Chapter 11 Bankruptcy and filed the Adversary Proceeding that is the subject of this appeal.

## DISCUSSION

*December 7, 1998 Decision Granting in Part and Denying in Part the FCC's Motion to Dismiss*

The First Amended Complaint of NextWave contained two claims, the first for constructive fraudulent conveyance subject to avoidance under 11 U.S.C. § 544 and the second for equitable subordination based on the FCC's "inequitable, unconscionable and unfair conduct" in auctioning other licenses before approving all of the C Block licenses. The Bankruptcy Court dismissed NextWave's second claim for

lack of subject matter jurisdiction and NextWave has not appealed. Thus, dismissal of that claim is not under review.

■ The Bankruptcy Court denied the FCC's motion to dismiss NextWave's claim for constructive fraudulent conveyance. The FCC asserted (1) that the Bankruptcy Court and District Court lack subject matter jurisdiction over NextWave's claim because jurisdiction over claims brought against the FCC in its regulatory capacity lies exclusively in the Circuit Courts of Appeals, 28 U.S.C. § 2342; 47 U.S.C. § 402; and (2) that the FCA preempts state fraudulent conveyance claims. The Bankruptcy Court held that for purposes of the fraudulent conveyance claim, the FCC was acting in its capacity as creditor rather than as regulator. As to the preemption claim, the Bankruptcy Court concluded that nothing in the FCA conflicts with a fraudulent conveyance claim or manifests an intent to legislate with respect to debtor-creditor relations or to exclude licensees from access to the Bankruptcy Court.

The Bankruptcy Court reasoned, and this Court agrees, that the fraudulent conveyance claim does not seek to litigate any issue with respect to the regulatory power granted the FCC by Congress. The claim has nothing to do with the FCC's "organization, execution, or implementation" of the radio spectrum auction. Neither does the claim implicate the FCC's power to regulate the issuance or use of spectrum licenses. The claim seeks the equitable remedy of avoidance available under 11 U.S.C. § 544 for the benefit of other creditors and the debtor, and implicates regulations and orders relevant to the FCC only in its role as creditor.

Although Congress has granted the FCC the regulatory power to control the issuance and use of these licenses, it did not grant regulatory power to the FCC to make rules or orders with respect to its own status as a creditor vis-a-vis its debtors or other creditors of its debtors. The

FCA specifically directs that the mandate to the FCC is not to collect revenue, and as the FCC cites in its brief, section 309(j) "alters only the licensing process, and has no effect on the requirements, obligations or privileges of license holders." 1993 U.S.C.C.A.N. at 585. The FCC argues that its powers to direct a debtor to pay the full amount of its debt, regardless of whether the debtor is in bankruptcy, derives from other sections of the FCA. Section 309(j) states, "Nothing in this subjection, or in the use of competitive bidding, shall diminish the authority of the [FCC] under the other provisions of this chapter to regulate or reclaim spectrum licenses." 47 U.S.C. § 309(j)(6)(C). But the FCA does not provide for the FCC's current method of "reclamation" wherein the FCC is attempting "to dictate its own rights as a creditor and thereby confound the rights of other creditors and the debtor established by Congress under the bankruptcy laws." (December 7, 1998 Bankruptcy Decision & Order).

■ The regulations outlining the steps to be taken by the FCC in the event of a default in payment of the installment notes are provisions of a contract between a creditor and debtor. As such, they are subject to revision and adjustment pursuant to the Bankruptcy Code, just as any similar debt. In any event, NextWave did not default, those steps were never taken, and no penalty was ever assessed.

■ The Restructuring Orders were the voluntary offers of a creditor to protect the solvency of its debtor in order to assure payment. Not only were these orders promulgated by the FCC in its capacity as a creditor, but also NextWave is not challenging the propriety of those orders, which provide relief to those who find it commercially viable and desire to take the benefit of such orders. NextWave is challenging the right of the FCC as a creditor of a bankrupt entity to recover on a fraudulently incurred obligation. As the Supreme Court stated in *United States v.*

*Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979),

> When the United States acts as a lender or guarantor, it does so voluntarily, with detailed knowledge of the borrower's financial status. The agencies evaluate the risks associated with each loan, examine the interests of other creditors, chose the security believed necessary to assure payment, and set the terms of every agreement....The Government therefore is in substantially the same position as private lenders, and the special status it seeks is unnecessary to safeguard the public fisc. Moreover, Congress' admonitions to extend loans judicially supports the view that it did not intend to confer special privileges on agencies that enter into the commercial field.

*Id.* at 736–37, 99 S.Ct. 1448. The regulations and orders noted above were the actions of a creditor who happens to be a federal agency. As a creditor and as a federal agency, the FCC is subject to the Bankruptcy Code. *See* 11 U.S.C. § 106(a) (providing that federal agencies are subject to § 544 claims). Congress could have exempted but did not exempt the FCC from the Bankruptcy Code.

The Bankruptcy Code confers upon the district courts and bankruptcy courts exclusive jurisdiction to administer the Bankruptcy Code and Rules and to resolve claims, adversary proceedings and contested matters arising under the Code. Specifically, 28 U.S.C. § 157(b)(2)(H) grants the Bankruptcy Court jurisdiction to determine "proceedings to determine, avoid, or recover fraudulent conveyances." The Bankruptcy Court therefore held that the constructive fraudulent conveyance dispute tendered by the Adversary Proceeding was within the subject matter jurisdiction of the Bankruptcy Court, and this Court agrees.

■ This Court also agrees that the FCA does not preempt the Bankruptcy Code or state fraudulent conveyance law. As this Court has already stated, Congress

must expressly exempt federal agencies from application of the Bankruptcy Code and Congress has not exempted the FCC. In addition, the FCA makes absolutely no attempt to regulate debtor-creditor relations.

Section 544 of the Bankruptcy Code provides that the court should use "applicable law" in determining whether a constructive fraudulent conveyance has occurred. Applicable law is generally state law, unless state law is preempted by federal law or state law is found to be inappropriate because of the involvement of the federal government as creditor (*See infra*). With regard to preemption, the FCA provides:

> **State Preemption.** (A) Notwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have any authority to regulate *the entry of or the rates charged* by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services.

47 U.S.C. § 332(c)(3). This provision does not explicitly preempt state fraudulent conveyance law. Moreover, state fraudulent conveyance law does not actually conflict with the FCA. It may conflict with self-interested regulations promulgated by the FCC in its capacity as a creditor, but those regulations were not promulgated pursuant to the FCA and are not about "frequency allocation, over which federal control is clearly exclusive." *Head v. New Mexico Board of Examiners*, 374 U.S. 424, 430 n. 6, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963).

*February 16, 1999 Decision Determining the "Effective Date"*

█ The FCC brought a motion for summary judgment to determine the "effective date" for purposes of § 544(b) of NextWave's $4.74 billion obligations. Under § 544(b), the "effective date" is the date that the "obligation [was] incurred," § 544(b). The Bankruptcy Court deter-

mined that the effective date was at the earliest January 3, 1997, which is the date the FCC approved NextWave's application for the sixty-three C Block licenses and the date of the promissory notes. The FCC argues, however, that the effective date is the date NextWave won the bids at auction on May 8 and July 23, 1996.

The obligation sought to be avoided is not any of the obligations incurred when the auction ended, but rather the obligation to pay the FCC the winning bid amount for the sixty-three licenses, which arose at the time the licenses were issued or the notes were executed. According to the FCC regulations, the winning bidder must apply for the license, which may or may not be granted because the public and other aspirants have the right to oppose the grant. Before the granting of the application and issuing of the licenses, there is no property to be valued. If the bidder is disqualified or defaults in connection with the application, the FCC may assess a penalty in the amount of the difference between the price ultimately received on resale and the original bidder's bid. Thus, the obligations incurred at auction are the obligations to pay any penalties assessed by the FCC. No penalties were assessed, so that obligation was never incurred. The obligation to pay the total winning bid price is not incurred until the application is processed and granted, and the licenses are thereby transferred to the bidder. Based on this reasoning, the findings of fact by the Bankruptcy Judge that the obligation was not incurred until administrative approval or grant of the licenses, here no earlier than January 3, 1997, is at the very least not clearly erroneous.

*April 2, 1999 Oral Decision Denying Dismissal*

The FCC moved for judgment on the pleadings for failure to state a claim under federal common law as set out by the Ninth Circuit Court of Appeals in *Kupetz v. Wolf*, 845 F.2d 842 (9th Cir.1988). The FCC argued that because the avoidance

claim challenges NextWave's contractual obligation to the United States pursuant to a national statutory scheme for regulating the commercial use of radio spectrum, federal common law should apply. The FCC also argued that the court should apply the *Kupetz* rule of federal common law, that a claim for fraudulent conveyance will not lie if subsequent creditors were on notice of the risks of the conveyance.

 On April 2, 1999, the Bankruptcy Court heard oral argument and ruled in an oral decision that it would not invent federal common law or apply the version presented by the FCC. The Bankruptcy Court reasoned, and this Court agrees, that federal common law is applied where application of existing state or federal law would undermine a federal regulatory program. *See United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 604, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973) ("[S]tate law may be found an acceptable choice, . . . even when the United States is a contracting party. However, in a setting in which the rights of the United States are at issue in a contract to which it is a party and the issue's outcome bears some relationship to a federal program, no rule may be applied which would not be wholly in accord with that program."). In this case, the application of 11 U.S.C. § 544(b) and thereby state fraudulent conveyance law will not abrogate the explicit terms or purposes of the regulatory scheme embodied in Section 309(j) or other sections of the FCA.

 This Court also agrees that even if the Bankruptcy Court had concluded that the "applicable law" is federal common law, the rule articulated in *Kupetz* is not the proper federal common law to apply to this case. The great majority of the creditors in this case extended credit before the auction, and before the licenses were issued and the allegedly fraudulent obligation was incurred. Therefore, NextWave's other creditors are not subsequent creditors with notice comparable to the creditors in *Kupetz*.

*May 12 and June 22, 1999 Findings of Fact and Conclusions of Law After Trial*

In the May 12 opinion, the Bankruptcy Court determined that the material elements of a fraudulent conveyance claim are the same under any law which could apply, that is, California law, New York law, District of Columbia law, and the Bankruptcy Code § 548. Applying those elements, the Bankruptcy Court found after trial that NextWave had proved its claim for constructive fraudulent conveyance. In the June 22 supplemental opinion, the Bankruptcy Court granted the remedy provided by § 544, that is, avoidance to the extent allowed under applicable law. The Bankruptcy Court determined under California law that the obligation was incurred on February 19, 1997, the date the notes were executed and went into effect. On that date, the C Block licenses were worth $1,023,211,000. All obligations beyond this amount were represented by the payments and notes held to be fraudulently conveyed. Thus, NextWave's non-fraudulent obligation was held to be $1,023,211,000. NextWave is thus currently obligated to pay $1,023,211,000 minus the amount paid as downpayment, $474,364,806, leaving a total current obligation of $548,846,194.

Other than its argument that the Bankruptcy Court should apply federal common law, which the Bankruptcy Court rejected in its April 2, 1999 Oral Decision, the FCC does not dispute the material elements of a fraudulent conveyance claim applied by the Bankruptcy Court to the facts determined at trial. This Court addressed and rejected this argument in its discussion of the April 2, 1999 Oral Decision and need not revisit it in the context of the Bankruptcy Court's Findings of Fact and Conclusions of Law after trial. The uncontested elements are as follows: NextWave must prove that (1) it incurred an obligation (2) at a time when it was engaged or was about to engage in a business or transaction for which the remaining assets of NextWave were unreasonably small in relation to the business or transaction, or

intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due (3) for which it did not receive reasonably equivalent value.

Other than its argument that the Bankruptcy Court should find that the effective date was the date of the auction, which the Bankruptcy Court rejected in its February 16, 1999 Summary Judgment Decision, the FCC does not contest the Bankruptcy Court's finding that NextWave incurred an obligation on February 19, 1997.[1] Again, this Court addressed and rejected this argument in its discussion of the February 16, 1999 Summary Judgment Decision and need not revisit it in the context of the Bankruptcy Court's Findings of Fact and Conclusions of Law after trial.

The FCC stipulated before trial to the second element of the claim that NextWave was insolvent on January 3 and February 14 and 19, 1997, and on June 8, 1998. The FCC does not contest the valuation of the licenses as of February 19, 1997, or the resultant conclusion that NextWave did not receive reasonably equivalent value for the obligation incurred. Thus, in challenging the Bankruptcy Court's Findings of Fact and Conclusions of Law, the FCC is really challenging only the remedy imposed by the Bankruptcy Court.

 The FCC argues that the Bankruptcy Court in fashioning its remedy failed to harmonize the FCA with the Bankruptcy Code because it "failed to recognize that the potential benefits of allowing NextWave to reorganize pale in comparison with the negative ramifications that follow from permitting spectrum licensees to avoid critical provisions of their regulatory agreements with the FCC by declaring bankruptcy." (Brief of Defendant–Appellant). The FCC asserts that allowing NextWave to keep the sixty-three licenses for a reduced obligation under-

mines the integrity, reliability and purpose of the regulatory scheme for competitive bidding, creates perverse incentives for bidders to bid to win while never intending to pay the bid but rather intending to go into bankruptcy after the auction, and hurts those who bid for but did not win the licenses when they were willing to pay much more than NextWave is now obligated to pay.

It is true that the Bankruptcy Court was required to balance the two enactments and "give effect to both if possible." *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). It is also true that the Bankruptcy Court did just that. The Bankruptcy Court spent three pages of its opinion delineating how its chosen remedy would fulfill the objectives of the Bankruptcy Code and § 309(j) of the FCA. This Court agrees that the remedy that best balances the objectives of the Bankruptcy Code and the FCA is avoidance of so much of the obligation as was fraudulently conveyed.

Section 544 provides specifically for the remedy of avoidance for a fraudulent conveyance: "The trustee may avoid ... any obligation incurred by the debtor that is voidable under applicable law." 11 U.S.C. § 544(b). Although the entire obligation is voidable, *In re Acequia, Inc.*, 34 F.3d 800, 809–10 (9th Cir.1994), the good faith obligee has the right to assert a claim for the value of the property transferred: "[T]o the extent a[n] ... obligation is voidable under section 544 ... a[n] obligee ... that takes for value and in good faith ... may enforce any obligation incurred ... to the extent that such ... obligee gave value to the debtor in exchange for such ... obligation." 11 U.S.C. § 548(c). If NextWave were required to return the licenses, the Company would be forced into dissolution. The remedy of avoidance of only the portion of the obligation that was fraudulently

---

**1.** There seems to be no material difference in the value of the licenses if the date of January 3, 1997 were to be used.

incurred is the statutory remedy and such remedy promotes equitable distribution among creditors and other parties by returning fraudulently transferred property to the estate and fosters the overall bankruptcy policy favoring reorganization over dissolution. *See In re Chateaugay Corp.,* 89 F.3d 942, 949 (2d Cir.1996) (noting policy favoring rehabilitation and reorganization evidenced by Bankruptcy Code and affirming 201 B.R. 48, 72 (Bankr.S.D.N.Y. 1996) ("Public Policy, as evidenced by chapter 11 of the Bankruptcy Code, strongly favors the reorganization and rehabilitation of troubled companies and concomitant preservation of jobs and going concern values.")); *see also In re Continental Airlines,* 91 F.3d 553, 565 (3d Cir. 1996) (noting same policy).

The objectives of Congress in enacting § 309(j) are the development and rapid deployment of new technology for the benefit of the public, the promotion of competition to ensure the efficient and intensive use of the spectrum, the provision of opportunity for small businesses to enter the field, and the recovery for the public of a portion of the value of the spectrum. *See* 47 U.S.C. § 309(j)(3). The remedy fashioned by the Bankruptcy Court supports these objectives. NextWave has invested millions of dollars in researching new technology and preparing a network that can utilize best the licenses it has. It is a small, innovative business with employees and small creditors as well as large creditors like the FCC. Allowing NextWave to keep and use the licenses promotes rapid deployment of technology without the delay of reauction and development of a new network by another company. It promotes small business entering a field with high barriers to entry. It allows the public to recover more than a portion of the current value of the spectrum licenses; the public is recovering more than two times the current value of the spectrum licenses.

Also, Congress made clear that maximizing revenue cannot be an objective. The FCC is recovering more than the value of the spectrum and should not now be trying to maximize revenue by trying to recover the winning bid.

The remedy fashioned by the Bankruptcy Court at the same time does not undermine the objectives of § 309(j). The FCC's assertions to the contrary are not persuasive. First, a company generally does not intend to jump into bankruptcy as part of its business plan. Bankruptcy is bad business. It is a laborious process in which reorganization is not always possible and the company's reputation may be destroyed. When and if a hypothetical bidder that would bid without intending to perform comes on the scene, the Bankruptcy Court as a court of equity can deal with the problem. This is not such a case, and the wisdom and propriety of the remedy must be reviewed in light of the facts of the actual case before Judge Hardin.

Second, the Bankruptcy Court found, and the FCC does not contest, that

> NextWave was not the only C block licensee to find the public capital markets closed. Approximately $1.6 billion of public financing was sought by C block licensees after the award of their licenses. Not one dollar of this $1.6 billion was raised in the public market. To this date, nearly three years after the 1996 auction and reauction, less than 10% of the C block licenses awarded by the FCC have been placed in service.

(May 12, 1999 Bankruptcy Decision). Thus, the C Block auction was a disaster for every participant. Those who bid but did not win are lucky, not hurt. They had the opportunity to bid at the D, E and F Block auctions and receive equivalent licenses for a fraction of the price NextWave is paying, even after the decision reducing its obligation. And if they had won the bid at the C Block auction, likely they would be in bankruptcy right now. The integrity and reliability of the C Block auction is not undermined by an avoidance remedy; it was undermined by the fact that 90% of the winning bidders are now bankrupt and/or paying an outrageously

inflated price. The FCC has not since run another auction like the C Block auction.

The Court thus agrees that the remedy fashioned by the Bankruptcy Court "is intuitively fair and equitable to both the government and the debtor's estate and implements both the letter and spirit of the Federal and state statutes and the case law governing debtor-creditor relations." (June 22, 1999 Bankruptcy Supplemental Decision). In addition, the remedy supports rather than undermines the objectives of the FCA, particularly § 309(j).

*June 16, 1999 Decision Denying Motion to Lift Automatic Stay*

 The Bankruptcy Court denied the FCC's motion to lift the automatic stay under 11 U.S.C. § 362(d)(1) for "cause." The FCC's asserted "cause" for a lift of the automatic stay was that by reason of the May 12 and June 22 opinions, NextWave would not be paying the full amount of its winning bids in the C Block auction, and thus would be defaulting. According to the FCC, the FCC therefore should be able to pursue the remedy set out in its regulations, that is, return of the licenses and foreclosure on the $4.26 billion allegedly outstanding. The FCC asserts that the automatic revocation of licenses and pursuit of debt collection procedures upon default are "mandated" by FCC regulations on the auction process and it should be allowed to proceed.

[12] The FCC fails to present cause for a lift of the automatic stay. As this Court has stated previously, he FCC regulations on automatic revocation and pursuit of debt collection are not part of the auction process; they are the FCC's rules governing its status as a creditor of licensees. Congress did not exempt the FCC from the Bankruptcy Code or grant the FCC the power to determine debtor-creditor relations. As such, the FCC is to be treated in this context as any other creditor. At present, NextWave's obligation has been reduced and it is not in default on the reduced obligation. There is no reason to believe that it will default. Indeed, it is highly likely that the debtor will confirm a plan of reorganization and will stay in business, putting the sixty-three licenses at issue in this case to good use for the benefit of creditors, employees, and the public at large. This fulfills the primary objective of the Bankruptcy Code to rehabilitate debtors for the benefit of all. *See In re Chateaugay Corp.*, 89 F.3d at 949, 201 B.R. at 72 ("Public Policy, as evidenced by chapter 11 of the Bankruptcy Code, strongly favors the reorganization and rehabilitation of troubled companies and concomitant preservation of jobs and going concern values.").

### CONCLUSION

For the foregoing reasons, the decisions and orders of the Bankruptcy Court in the Adversary Proceeding are affirmed.

SO ORDERED.