PER CURIAM.
 

 The Federal Communications Commission (the “FCC”) appeals from an order of the United States District Court for the Southern District of New York (Charles L. Brieant, Judge),
 
 NextWave Personal Communications, Inc. v. FCC (In re NextWave Personal Communications, Inc.),
 
 241 B.R. 311 (S.D.N.Y.1999), affirming five decisions and orders of the United States Bankruptcy Court for the Southern District of New York (Adlai S. Hardin, Jr.,
 
 Bankruptcy Judge).
 

 [1]
 

 On November 24,
 
 *46
 
 1999, we issued an order reversing the judgment of the district court and remanding the case for further proceedings, with an opinion to follow. This is that opinion.
 

 In pertinent part, the decisions and orders of the bankruptcy court, affirmed by the district court judgment from which the FCC appeals, held that the FCC’s grant to NextWave Personal Communications, Inc. (“NextWave”) of sixty-three radio spectrum licenses for which NextWave had been the high bidder at the FCC’s 1995-96 “C-block” auction (the “Licenses”) was a constructively fraudulent conveyance for purposes of 11 U.S.C. § 544 (“ § 544”).
 
 See NextWave
 
 IV.A, 235 B.R. at 304. The bankruptcy court therefore avoided $3.7 billion of NextWave’s $4.74 billion obligation to the FCC, allowing NextWave to keep the Licenses while it reorganized in bankruptcy.
 
 See NextWave
 
 IV.B, 235 B.R. 305. We hold that the bankruptcy court had no authority thus to interfere with the FCC’s system for allocating spectrum licenses, and that in any event it wrongly concluded that the Licences were fraudulently conveyed by failing to defer to the FCC’s interpretation of its own regulations when determining the point at which NextWave’s obligations were incurred for § 544 purposes. We therefore reverse the judgment of the district court affirming the orders of the bankruptcy court and remand the case to the bankruptcy court for further proceedings consistent with this opinion, if any are necessary.
 

 BACKGROUND
 

 In 1993 Congress passed several amendments to the Federal Communications Act (the “FCA”), one of which added § 309(j).
 
 See
 
 Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103-66, § 6002(a), 107 Stat. 312, 387 (1993). Section 309(j) authorized the FCC to conduct competitive bidding auctions for radio spectrum licenses. The FCC was instructed to ensure that as part of its auction plan certain blocks of spectrum would be reserved for qualified entities, including small businesses, and that deferred payment plans on favorable terms would be available to them.
 
 See
 
 47 U.S.C. § 309(j)(3)(B), (j)(4)(D). Pursuant to these instructions, the FCC reserved a block of 493 licenses known as the “C-block licenses” for the use of qualified entities providing “personal communications services,” an emerging form of wireless communications technology.
 

 On May 6 and July 16, 1996, the FCC concluded two sets of C-block auctions, which produced some ninety successful bidders.
 
 [2]
 
 NextWave, a startup company established to take advantage of the opportunities created by § 309(j), was the high bidder for sixty-three C-block licenses. Its aggregate winning bids amounted to $4.74 billion.
 

 Pursuant to the FCC regulations issued under § 309(j), winning bidders that were “small businesses” were required to pay only ten percent of their winning bids in cash; the remaining ninety percent could be paid in installments over a ten-year period at below market interest rates. 47 C.F.R. § 24.711(b)(3). NextWave made the required five percent down payment on the Licenses when it was announced as the
 
 *47
 
 high bidder on them in the summer 1996,
 
 [3]
 
 and subsequently deposited another five percent with the FCC on January 9, 1997, immediately after its application for the Licenses was conditionally approved. of
 

 The four-month gap between those two dates resulted from the FCC’s auction rules under which a winning bid did not automatically trigger the grant of the license or licenses in question. A winning bidder was required to submit a “long form” application, and the grant of a winning bidder’s licenses was conditioned upon that bidder’s ability to demonstrate through its application that it was in compliance with FCC regulations and statutory requirements. While over ninety percent of the winning bidders at the C-block auctions were granted their licenses on September 17, 1996, NextWave’s ownership structure, specifically its allegedly im-permissibly high percentage of foreign ownership, was challenged. The Licenses were conditionally granted to NextWave on January 3, 1997, after NextWave submitted to the FCC a plan to bring its capital structure into compliance with FCC regulations. On February 14, 1997, the FCC granted NextWave the Licenses conditioned upon NextWave issuing a series of promissory notes for the balance of its payments. On February 19, 1997, Nex-tWave executed these promissory notes (the “Notes”), backdated to January 3. The Notes aggregated $4.27 billion, representing the remaining ninety percent of the bid price. By the time the Notes were executed, however, the market value of the Licenses, as later determined by the bankruptcy court,
 
 see NextWave
 
 IV.A, 235 B.R. at 303, had fallen to less than a quarter of the amount that NextWave had bid for them.
 

 The C-block auctions were part of a series of auctions the FCC conducted to allocate spectrum for new technological uses. Prior to the C-block auctions, it had conducted the A and B-block auctions, and in June 1996 it announced that it would conduct the D, E and F-block auctions starting on August 26, 1996. The winning bids at the A, B, D, E and F-block auctions were sharply lower than the winning bids at the C-block auctions when measured in dollars per MHz-Pop, a generally accepted industry measurement standard.
 
 [4]
 

 Since they were obligated to pay what turned out to be much higher prices for their licenses than other licensees, most of the winning C-block bidders, including NextWave, had difficulty securing the financing necessary for them to meet their financial commitments. They thus faced the prospect of an early default on their installment payments to the FCC.
 

 The winning C-block bidders therefore petitioned the FCC for relief. In response, the FCC suspended the C-block installment payments and initiated an elaborate administrative process looking to
 
 *48
 
 ward a restructuring of the C-block licensees’ obligations.
 

 On October 16, 1997, at the culmination of this process, the FCC issued a restructuring order,
 
 In the Matter of Amendment of the Commission’s Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licensees, Second Report and Order,
 
 FCC 97-342, 12 F.C.C.R. 16436 (Oct. 16, 1997), 1997 WL 643811 (F.C.C.) (the “Restructuring Order”), which offered troubled C~ block license holders three mutually exclusive restructuring options, ranging from amnesty — return of the licenses in exchange for forgiveness of debt obligations — to a plan that allowed bidders to keep as many of their licenses as they could pay for by converting seventy percent of their down payment into a prepayment of the full bid price of a smaller number of licenses. The FCC decided that it would be contrary to the public interest to forgive a portion of the obligations, thereby allowing bidders to keep their licenses at a significantly reduced price, because the C-block auction had been designed to ensure that licenses were allocated to users who could demonstrate, through their ability to pay the highest price, that they possessed the most highly valued use for the licenses.
 
 Id.
 
 at ¶¶ 5, 19.
 

 In response to the oppositions, petitions and replies that it received after the release of the Restructuring Order, the FCC issued a reconsideration order on March 24, 1998.
 
 See In the Matter of Amendment of the Commission’s Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licenses, Order on Reconsideration of the Second Report and Order,
 
 F.C.C. 98-46, 13 F.C.C.R. 8346 (Mar. 24, 1998), 1998 WL 130176 (F.C.C.) (the “Reconsideration Order”). The Reconsideration Order offered licensees slightly more flexibility in their decision-making process than the Restructuring Order, but otherwise left the Restructuring Order’s framework intact. In response to still further petitions from C-block licensees, the FCC conducted yet more proceedings and issued a second reconsideration order,
 
 In the Matter of Amendment of the Commission’s Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licenses, Second Order on Reconsideration of the Second Report and Order,
 
 F.C.C. 99-66, 14 F.C.C.R. 6571 (Apr. 6, 1999), 1999 WL 183822 (F.C.C.) (the “Second Reconsideration Order”), which essentially reaffirmed the determinations the FCC had made in its previous two orders.
 

 NextWave actively participated in the administrative process that led to the promulgation of these orders, but it remained dissatisfied with the results. On May 29, 1998, NextWave filed a petition with the Court of Appeals for the District of Columbia Circuit asking for review of the orders. On June 8, 1998 — the deadline for selecting from the menu of restructuring options provided by the orders — it asked both the FCC and the Court of Appeals for a stay of those orders so that it would have more time to consider its options. The FCC and the Court of Appeals each denied Nex-tWave’s request.
 
 See NextWave Telecom Inc. v. FCC,
 
 No. 98-1255 (D.C.Cir. June 11, 1998);
 
 In the Matter of Petition of NextWave Telecom, Inc. for a Stay of the June 8, 1998, Personal Communications Services C Block Election Date,
 
 FCC 98-104, 13 F.C.C.R. 11880 (June 1,1998), 1998 WL 278735 (F.C.C.). The same day, Nex-tWave filed a Chapter 11 petition and instituted an adversary proceeding against the FCC that sought to avoid the company’s obligations resulting from its acquisition of the Licenses.
 
 See NextWave I,
 
 235 B.R. at 267.
 

 NextWave asserted two claims in the adversary proceeding. First, it argued that the transaction in which it acquired the Licenses was a fraudulent conveyance subject to avoidance under § 544 of the Bankruptcy Code (the “Code”). Second, it sought equitable subordination of the FCC’s claim based on the FCC’s “inequita
 
 *49
 
 ble, unconscionable and unfair conduct” in auctioning the D, E and F-block licenses before approving NextWave’s application for the C-block Licenses. The FCC moved to dismiss both claims.
 

 The bankruptcy court dismissed the second claim for lack of subject matter jurisdiction,
 
 see NextWave I,
 
 235 B.R. at 271; NextWave has not appealed from that order. Only the first claim is therefore before us. The FCC argued below that the bankruptcy court also lacked subject matter jurisdiction over this claim because jurisdiction over actions brought against the FCC in its regulatory capacity lies exclusively in the federal courts of appeals pursuant to 28 U.S.C. § 2842 and 47 U.S.C. § 402. The FCC also argued that the FCA preempted state fraudulent conveyance law. The bankruptcy court rejected these arguments, holding that for purposes of the fraudulent conveyance claim, the FCC was acting in its capacity as creditor rather than as regulator. See
 
 NextWave I,
 
 235 B.R. at 269-71. The court therefore concluded that it had jurisdiction over the claim, and further found that the FCA did not conflict with or preempt its application of fraudulent conveyance law under § 544.
 

 Section 544(b) of the Code allows the avoidance of “any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law.” Applicable law includes various state fraudulent conveyance statutes, many based on the Uniform Fraudulent Transfer Act.
 
 [5]
 

 See Sender v. Simon,
 
 84 F.3d 1299, 1304 (10th Cir.1996). In analyzing a fraudulent conveyance claim under the act, courts determine whether the debtor was engaged or about to engage in a transaction for which the remaining assets of the debtor were unreasonably small in relation to the size of the transaetion. If so, and if the consideration provided by the debtor for the allegedly fraudulent transfer was not reasonably equivalent to what the debtor received in return on the effective date of the transfer, then the transfer is deemed constructively fraudulent and can be avoided.
 
 [6]
 

 See NextWave IV.A,
 
 235 B.R. at 287-89. In NextWave’s case, if there is a § 544 claim at all, its resolution turns on when Nex-tWave’s obligations to pay arose. If that is deemed to be the close of the C-block bidding, then the transfer could not be constructively fraudulent because Nex-tWave paid exactly the market price for the Licenses as of that date, as determined by its own bid.
 
 See NextWave IV.A,
 
 235 B.R. at 297 n. 9. However, if the effective date is deemed to be January 3, the date on which the Licenses were conditionally granted, or February 19, 1997, the date on which they were finally granted in return for the executed Notes, then the obligation when it arose was for an amount far greater than what the bankruptcy court deemed to be the market price of the Licenses.
 

 Hoping to resolve this issue quickly, the FCC moved for summary judgment on the question of when NextWave’s $4.74 billion obligation was incurred. Despite the FCC’s argument that under its regulations the entire obligation became due at the close of the C-block auction, the bankruptcy court found that the effective date of NextWave’s obligations for the purposes of § 544(b) was January 3, 1997.
 
 See NextWave II,
 
 235 B.R. at 276. The court acknowledged that 47 C.F.R. § 1.2104 subjected a winning bidder to a penalty upon default based on the difference between its bid and the high bid on reauction of the licenses, but held that “[njothing in this calculation explicitly or implicitly binds the winning bidder to the full amount of its bid.”
 
 Id.
 
 at 275.
 

 
 *50
 
 The FCC then moved to dismiss the complaint on the ground that the avoidance claim challenged a contractual relationship with the United States entered into pursuant to a national regulatory scheme, and that federal common law, rather than state fraudulent conveyance law, therefore was the “applicable law” under § 544. In an oral decision,
 
 Nex-tWave III,
 
 tr. at 50-51, the bankruptcy court refused to create new federal common law to govern the situation, reasoning that fraudulent conveyance law did not abrogate the explicit terms or purposes of the regulatory scheme under § 309(J).
 
 See id.,
 
 tr. at 53-54.
 

 The parties then proceeded to trial. The bankruptcy court concluded under California law that NextWave’s obligations were incurred on February 19, 1997; that on that date the Licenses were worth $1,023,211,000; and that all obligations above that amount were constructively fraudulent and therefore avoided. Since NextWave had already paid $474,364,806, or ten percent of its original high bid, to the FCC as a down payment, the remaining obligation was reduced to $548,846,194.
 
 See NextWave IV.A,
 
 235 B.R. at 304;
 
 NextWave IV.B,
 
 235 B.R. at 306. The avoidance remedy allowed NextWave to keep the Licenses while obligating it to pay less than one-quarter of the amount it had bid for them.
 

 The FCC appealed to the district court, which affirmed for substantially the reasons stated by the bankruptcy court.
 
 NextWave Personal Communications, Inc. v. FCC (In re NextWave Personal Communications, Inc.),
 
 241 B.R. 311 (S.D.N.Y.1999). This appeal, which we have heard on an expedited basis, followed.
 

 DISCUSSION
 

 I. Standard of Review
 

 Our review of the district court’s decision affirming the bankruptcy court orders is plenary. We therefore undertake an independent examination of the legal and factual findings of the bankruptcy court, reviewing its findings of law de novo and its findings of fact for clear error.
 
 See Kabro Assocs. v. Colony Hill Assocs. (In re Colony Hill Assocs.),
 
 111 F.3d 269, 273 (2d Cir.1997).
 

 II. The Authority of the Bankruptcy and District Courts
 

 The radio (or electromagnetic) spectrum belongs to no one. It is not property that the federal government can buy or sell. It is no more government-owned than is the air in which Americans fly their airplanes or the territorial waters in which they sail their boats.
 

 Although not owned by the federal government, the radio spectrum is subject to strict governmental regulation.
 

 Before 1927, the allocation of [radio] frequencies was left entirely to the private sector, and the result was chaos. It quickly became apparent that broadcast frequencies constituted a scarce resource whose use could be regulated and rationalized only by the Government. Without government control, the medium would be of little use because of the cacophony of competing voices, none of which could be clearly and predictably heard.
 

 Red Lion Broadcasting Co. v. FCC,
 
 395 U.S. 367, 375-76, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (footnotes omitted). The scarcity of radio frequencies therefore required a regulatory mechanism to divide the electromagnetic spectrum and assign specific frequencies to specific users.
 
 See Turner Broadcasting Sys., Inc. v. FCC,
 
 512 U.S. 622, 637-38, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994);
 
 see also National Broadcasting Co. v. United States,
 
 319 U.S. 190, 216, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (“The facilities of radio are not large enough to accommodate all who wish to use them. Methods must be devised for choosing from 'among the many who apply.”). Since 1934, that mechanism has been the licensing of blocks of spectrum for the “public
 
 *51
 
 interest, convenience, or necessity,” under the FCA, 47 U.S.C. § 307(a), by the FCC.
 
 See generally FCC v. Pottsville Broadcasting Co.,
 
 309 U.S. 134, 136-38, 60 S.Ct. 437, 84 L.Ed. 656 (1940).
 

 A license does not convey a property right; it merely permits the licensee to use the portion of the spectrum covered by the license in accordance with its terms.
 
 See
 
 47 U.S.C. § 301 (stating the purpose of the FCA, “to provide for the use of [radio] channels, but not the ownership thereof’);
 
 FCC v. Sanders Bros. Radio Station,
 
 309 U.S. 470, 475, 60 S.Ct. 693, 84 L.Ed. 869 (1940) (“[N]o person is to have anything in the nature of a property right as a result of the granting of a license.”). Licenses are revocable by the FCC, and the FCC can impose conditions upon them in the name of the public good.
 
 See
 
 47 U.S.C. § 308(b).
 

 Historically, the FCC assigned licenses through a system of comparative hearings, rating and ranking applicants under a public interest standard.
 
 See
 
 47 U.S.C. § 309(a). Partially in response to the huge administrative burden that this method of allocation placed on the FCC, Congress amended the FCA in 1981 by adding § 309(i), which allowed the FCC to award licenses by randomly selecting licensees from the qualified applicant pool.
 
 See
 
 Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97-35, § 1242, 95 Stat. 357, 736 (codified at 47 U.S.C. § 309(i)).
 

 The use of lotteries lessened the administrative burden, but encouraged speculation and, ultimately, failed to allocate licenses to those most likely to use them most efficiently or beneficially. Especially in light of the proliferation of new spectrum-dependent communications technologies, a method was needed that would direct licenses toward those entities and technologies that would put them to the best use.
 
 See
 
 H.R.Rep. No. 103-111, at 248 (1993) (the “Committee Report”), re
 
 printed in
 
 1993 U.S.C.C.A.N. 378, 575.
 

 In its search for such a methodology, Congress came to the conclusion that using market forces to allocate spectrum could accomplish congressionally defined policy goals. As the House Committee on Energy and Commerce explained, “[A] carefully designed system to obtain competitive bids from competing qualified applicants can speed delivery of services, promote efficient and intensive use of the electromagnetic spectrum, prevent unjust enrichment, and produce revenues to compensate the public for the use of the public airwaves.”
 
 Id.
 
 at 253,
 
 reprinted in
 
 1993 U.S.C.C.A.N. at 580. Congress therefore enacted 47 U.S.C. § 309(j) authorizing the FCC to develop a system for allocating spectrum through a competitive bidding process.
 
 See
 
 Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103-66, § 6002(a), 107 Stat. 312, 387 (1993). Section 309(j)(3) requires the FCC to design a system of competitive bidding that protects the public interest and promotes the following substantive objectives:
 

 (A) the development and rapid deployment of new technologies, products, and services for the benefit of the public, including those residing in rural areas, without administrative or judicial delays;
 

 (B) promoting economic opportunity and competition and ensuring that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women;
 

 (C) recovery for the public of a portion of the value of the public spectrum resource made available for commercial use and avoidance of unjust enrichment through the methods employed to award uses of that resource; [and]
 

 (D) efficient and intensive use of the electromagnetic spectrum....
 

 47 U.S.C. § 309(j)(3).
 

 While the FCC was expected to “recover[ ] for the public a portion of the value of
 
 *52
 
 the public spectrum” and to avoid “unjust enrichment,” the broader purpose of § 309(j) was to create an efficient regulatory regime based on the congressional determination that competitive bidding is the most effective way of allocating resources to their most productive uses. The FCC was not asked to sell off the spectrum (something it did not own) in an effort to raise as much money as possible; it was not asked to develop a free-market system to maximize revenue.
 
 [7]
 
 Instead, it was told to auction licenses to the highest bidder because such a system was thought likely to promote the development of new technologies and encourage efficient use of the spectrum, while simultaneously recouping some of the value of the spectrum for the public.
 
 See
 
 Committee Report at 253,
 
 reprinted in
 
 1993 U.S.C.C.A.N. at 580.
 

 In implementing § 309(j), the FCC echoed the congressional rationale: “[AJuction designs that award licenses to the parties that value them most highly will best achieve” the goals set forth by Congress.
 
 In the Matter of Implementation of Section 309(j) of the Communications
 
 Act—
 
 Competitive Bidding, Second Report and Order,
 
 FCC 94-61, 9 F.C.C.R. 2348 ¶70 (Apr. 20, 1994), 1994 WL 412167 (F.C.C.) (“Second Order”). The FCC’s views reflect a classical belief in the efficacy of market forces:
 

 Since a bidder’s abilities to introduce valuable new services and to deploy them quickly, intensively, and efficiently increases the value of a license to a bidder, an auction design that awards licenses to those bidders with the highest willingness to pay tends to promote the development and rapid deployment of new services in each area and the efficient and intensive use of the spectrum.
 

 Id.
 
 ¶ 71.
 

 Starting from this premise — that “[b]e-cause new licenses would be paid for, a competitive bidding system [would] ensure that spectrum is used more productively and efficiently than if handed out for free,” Committee Report at 249,
 
 reprinted in
 
 1993 U.S.C.C.A.N. at 576 — the FCC made “full and timely payment of the winning bid” a regulatory condition for obtaining and retaining a spectrum license acquired through a § 309(j) auction.
 
 See
 
 47 C.F.R. § 24.708.
 

 This “payment in full” requirement has a regulatory purpose related directly to the FCC’s implementation of the spectrum auctions. The FCC gave considerable thought to the problem of how to “deter frivolous or insincere bidding.” Second Order ¶ 171. It decided that it would be “critically important to the success of our system of competitive bidding ... [to] provide strong incentives for potential bidders to make certain of their qualifications and financial capabilities before the auction so as to avoid delays in the deployment of new services to the public that would result from litigation, disqualification and re-auction.” Id. ¶ 197.
 

 Generally, bidders were required to obtain purely private financing and to pay up front for their licenses.
 
 [8]
 

 See
 
 47 C.F.R. § 1.2109(a); Second Order ¶ 194. But
 
 *53
 
 “designated entities,” such as NextWave— “designated” because they were less financially powerful than non-“designated” bidders and therefore presumably unable to pay up front — were allowed to pay in installments.
 
 See
 
 47 C.F.R. § 24.711(b); Second Order ¶ 194. It was important for the functioning of the auction of licenses to “designated entities” that the FCC’s default rules and penalties be enforceable, because the FCC relied upon them as a substitute for conducting the “detailed credit checks” and other forms of due diligence that otherwise would be necessary to ensure, within the framework of a competitive auction method of spectrum allocation, that the licenses would be awarded to the appropriate entities.
 
 See
 
 Second Order ¶¶ 194,197-98.
 
 [9]
 

 For entities like NextWave that chose to pay the balance of their winning bids in installments, payment of the installments in full was explicitly made a condition of license retention.
 
 See
 
 47 C.F.R. § 1.2110(f)(4)(iii). When this condition was challenged as a result of the precipitous decline in auction values following the C-block auction, the FCC conducted extensive administrative proceedings on the question and produced three orders declaring that C-block bidders could not keep their licenses without paying the full bid price for them.
 
 See Restructuring Order
 
 ¶¶ 2, 5;
 
 Reconsideration Order
 
 ¶¶ 2, 10;
 
 Second Reconsideration Order
 
 ¶ 1. It sought in this manner to adhere to the fundamental rationale of the competitive scheme: Those qualified bidders who could pay the most were those who should be awarded the licenses.
 
 See Restructuring Order
 
 ¶ 19;
 
 see also Second Order
 
 ¶ 5. These rules and orders, which express the FCC’s expert judgment as to the course that would best promote congressional objectives and serve the public interest, thus manifest substantive regulatory decisions about the allocation of spectrum.
 

 Despite the new statutory scheme for allocating spectrum, the FCA draws no categorical distinctions among the three methods of license allocation — comparative hearing, lottery and auction. Each is presumed to be a regulatory tool for ensuring that licenses are distributed in the way that fulfils the goals of the FCA.
 
 See
 
 47 U.S.C. § 309(a). And each license, on whatever basis it is awarded, is not to “be construed to create any right, beyond the terms, conditions, and periods of the license.” 47 U.S.C. § 301.
 

 A. The FCC and the Courts
 

 The Supreme Court has emphasized that the FCA’s “terms, purposes, and history all indicate that Congress formulated a unified and comprehensive regulatory system.”
 
 United States v. Southwestern Cable Co.,
 
 392 U.S. 157, 168, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) (internal quotation marks and citation omitted). “Congress assigned to the Federal Communications Commission ... exclusive authority to grant licenses” under the Act.
 
 Metro Broadcasting, Inc. v. FCC,
 
 497 U.S. 547, 553, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990),
 
 overruled on other grounds, Adarand Constructors, Inc. v. Pena,
 
 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). The FCC was “expected to serve as the single Government agency with unified jurisdiction and regulatory power over all forms of electrical communication, whether by telephone, telegraph, cable, or radio.”
 
 Southwestern Cable Co.,
 
 392 U.S. at 168, 88 S.Ct. 1994 (internal quotation marks and footnotes omitted). In this case, we are required to “enforce the spheres of authority which Congress has given to the Commission and the courts, respectively, through its scheme for the regulation of’ radio transmissions.
 
 Pottsville Broadcasting Co.,
 
 309 U.S. at 136-37, 60 S.Ct. 437.
 

 
 *54
 
 For over fifty years the Supreme Court has recognized that under the FCA the division of authority between these “spheres” requires that “no court can grant an applicant an authorization which the Commission has refused.”
 
 Scripps-Howard Radio v. FCC,
 
 316 U.S. 4, 14, 62 S.Ct. 876, 86 L.Ed. 1229 (1942). Under the FCA, it is the FCC and not the courts that “must be satisfied that the public interest will be served by ... the license.”
 
 FCC v. WOKO, Inc.,
 
 329 U.S. 223, 229, 67 S.Ct. 213, 91 L.Ed. 204 (1946).
 

 The FCC’s exclusive jurisdiction extends not only to the granting of licenses, but to the conditions that may be placed on their use:
 

 An FCC licensee takes its license subject to the conditions imposed on its use. These conditions may be contained in both the Commission’s regulations and in the license. Acceptance of a license constitutes accession to all such conditions. A licensee may not accept only the benefits of the license while rejecting the corresponding obligations.
 

 P & R Temmer v. FCC,
 
 743 F.2d 918, 927 (D.C.Cir.1984).
 

 If the conditions to which a license is subject are not met, the FCC may revoke the license. It is beyond the jurisdiction of a court in a collateral proceeding to mandate that a licensee be allowed to keep its license despite its failure to meet the conditions to which the license is subject.
 

 When the FCC decides which entities are entitled to spectrum licenses under rules and conditions it has promulgated, it therefore exercises the full extent of its regulatory capacity. Because jurisdiction over claims brought against the FCC in its regulatory capacity lies exclusively in the federal courts of appeals,
 
 see
 
 28 U.S.C. § 2342; 47 U.S.C. § 402, the bankruptcy and district courts lacked jurisdiction to decide the question of whether NextWave had satisfied the regulatory conditions placed by the FCC upon its retention of the Licenses.
 

 B. The Rulings of the Bankruptcy and District Courts
 

 It is against this background that the inability and consequent failure of NextWave to pay for its C-block Licenses must be considered. The FCC had not sold NextWave something that the FCC had owned; it had used the willingness and ability of NextWave to pay more than its competitors as the basis on which it decided to grant the Licenses to Nex-tWave. NextWave’s inability to follow through on its financial undertakings had more than financial implications. It indicated that under the predictive mechanism created by Congress to guide the FCC, NextWave was not the applicant most likely to use the Licenses efficiently for the benefit of the public in whose interest they were granted. It meant, in regulatory terms, that NextWave was not entitled to the Licenses.
 

 NextWave urged the bankruptcy and district courts to treat these proceedings as “a simple bankruptcy case.” The courts apparently agreed. The bankruptcy court found that “the issues before [it] ... concerned] solely the debtor-creditor relationship between the FCC and [NextWave].”
 
 NextWave V,
 
 235 B.R. at 314. According to the district court, “[t]he claim ha[d] nothing to do with the FCC’s ‘organization, execution, or implementation’ of the radio spectrum auction. Neither d[id] the claim implicate the FCC’s power to regulate the issuance or use of spectrum licenses.”
 
 NextWave,
 
 241 B.R. 311.
 

 This approach was fundamentally mistaken. The FCC’s auction rules promulgated under § 309(j) have primarily a regulatory purpose: to ensure that spectrum licenses end up in the hands of those most likely to further congressionally defined objectives. The fact that market forces are the technique used to achieve that regulatory purpose does not turn the FCC into a mere creditor, any more than it
 
 *55
 
 turns an FCC license won at auction into a property estate in spectrum. Nothing about putting spectrum licenses up for auction rendered them anything other than licenses, and the sole responsibility for the allocation of licenses lies with the FCC, with appeal to the courts of appeals, not the bankruptcy or district courts.
 

 By holding that for a price of $1.023 billion NextWave would retain licenses for which it had bid $4.74 billion, the bankruptcy and district courts impaired the FCC’s method for selecting licensees by effectively awarding the Licenses to an entity that the FCC determined was not entitled to them.
 
 [10]
 
 In so doing they exercised the FCC’s radio-licensing function.
 
 Cf. National Broadcasting Co.,
 
 319 U.S. at 224, 63 S.Ct. 997. “[T]he weighing of policies under the ‘public interest’ standard is a task that Congress has delegated to the Commission in the first instance,”
 
 FCC v. WNCN Listeners Guild,
 
 450 U.S. 582, 596, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981) (internal quotation marks and citation omitted), with deferential judicial review reserved to the courts of appeals. But even if the bankruptcy and district courts were right in concluding that granting the Licenses at a small fraction of NextWave’s original successful bid price best effectuated the FCA’s goals,
 
 see NextWave III,
 
 241 B.R. 311;
 
 NextWave IV.B,
 
 235 B.R. at 311-12, they were utterly without the power to order that NextWave be allowed to retain them for that reason or on that basis.
 
 See Scripps-Howard Radio, Inc.,
 
 316 U.S. at 14, 62 S.Ct. 875.
 

 This is not to say that these courts lacked jurisdiction over every aspect of the relationship between the FCC and Nex-tWave. To the extent that the financial transactions between the two do not touch upon the FCC’s regulatory authority, they are indeed like the obligations between ordinary debtors and creditors. Nex-tWave’s arguments that the FCC seeks to frustrate the purposes of the bankruptcy laws are therefore misplaced. We are merely holding that NextWave may not collaterally attack or impair in the bankruptcy courts the license allocation scheme developed by the FCC.
 
 [11]
 

 As Justice Frankfurter noted nearly sixty years ago, “[t]he Communications Act ... expresses a desire on the part of Congress to maintain, through appropriate administrative control, a grip on the dynamic aspects of radio transmission.”
 
 Pottsville Broadcasting Co.,
 
 309 U.S. at 138, 60 S.Ct. 437. In response to changing technological imperatives and policy preferences, Congress and the FCC have chosen to manage the “dynamic aspects” of spectrum allocation in a new way, by employing market forces in an attempt to ensure efficient and publicly beneficial resource allocation. Despite subsequent revolutions in technology, however, the observation of Justice Frankfurter still holds: In order for Congress’s prescribed regulatory system to function properly in a dynamic environment, the FCC’s allocative decisions must not be interfered with by other instrumentalities of the federal govern
 
 *56
 
 ment acting beyond their statutory authority.
 

 III. Constructive Fraud
 

 While we reverse the district court’s affirmance of the bankruptcy court orders issued in the adversary proceeding, and hold that these courts lacked jurisdiction to employ remedies that abrogate the FCC’s licensing authority, we recognize that NextWave will remain a debtor in bankruptcy. If the Licenses are returned to the FCC, the bankruptcy court may resolve resulting financial claims that the FCC has against NextWave as it would the claims of any government agency seeking to recover a regulatory penalty or an obligation on a debt. In light of these possible further proceedings, there remains for us the question of the nature of NextWave’s obligation, which the bankruptcy court decided,
 
 see NextWave IV.A,
 
 235 B.R. at 287-91, and which may on remand have substantial effect on the determination of the FCC’s rights as creditor.
 
 [12]
 
 We hold, contrary to the rulings by the bankruptcy and district courts, that NextWave became obligated to the FCC for the full amount of its winning bids at the close of the C-block auction, and that the transaction in which the Licenses were issued was therefore not constructively fraudulent.
 

 Under the avoidance provisions of the Code, a transfer or obligation is or is deemed to be a fraudulent conveyance— and therefore avoidable — if the debtor “received less than a reasonably equivalent value in exchange for such transfer or obligation.” 11 U.S.C. §§ 544, 548(a)(2)(A) (1993 & Supp.1999).
 
 [13]
 
 It is uncontested that the question of reasonably equivalent value is determined by the “value of the consideration exchanged between the parties
 
 at the time of the conveyance or incur-rence of debt
 
 which is challenged.”
 
 NextWave IVA
 
 235 B.R. at 290 (citing
 
 In re Best Products Co.,
 
 168 B.R. 35, 54 (Bankr.S.D.N.Y.1994)) (emphasis added).
 

 The date on which the payment obligation arose is therefore crucial to whether this obligation is avoidable. If NextWave incurred the obligation at the close of the auctions, then the value of the Licenses would by definition be $4.74 billion, since “the fair market values of the C block licenses were equivalent to the bids accepted'by the FCC at the close of the auction and reauction.”
 
 NextWave IV.A,
 
 235 B.R. at 297 n. 9 (noting NextWave’s concession of this point). And if the fair market value was $4.74 billion, then there was no constructive fraud. On the other hand, if the obligation first arose on or about the date on which the Licenses were conditionally granted (following the fall-off in auction prices at the D, E and F-block auctions), then the $4.74 billion bid exceeded the fair market value as measured by the subsequent auction prices.
 

 The bankruptcy court held that Nex-tWave’s payment obligation did not arise until the conditional grant of the Licenses on January 3, 1997. The court placed great weight on the idea that an obligation evidenced by a writing arises when the writing is delivered:
 

 Generally an obligation is incurred when a debtor becomes legally obligated to pay.
 
 In re Emerald Oil Co.,
 
 695 F.2d 833, 837 (5th Cir.1983);
 
 Barash v. Public Finance Corp.,
 
 658 F.2d 504, 511 (7th Cir.1981);
 
 see also In re G. Survivor Corp.,
 
 217 B.R. 433, 440 (Bankr.S.D.N.Y.1998). While the Bankruptcy Code is silent on the question of when a debt or obligation
 
 *57
 
 is “incurred,” courts have not questioned that an “obligation” to pay-principal indebtedness under a promissory note is “incurred” on the date the note is executed and delivered.
 
 E.g., In re Iowa Premium Service.,
 
 695 F.2d 1109, 1111-12 (8th Cir.1982);
 
 In re Smith-Douglass, Inc.,
 
 842 F.2d 729, 730 (4th Cir.1988);
 
 In re Pippin,
 
 46 B.R. 281, 283-84 (Bankr.W.D.La.1984) (holding that, for preference purposes, debtor becomes legally obligated to pay under installment payment contract when contract is executed). The California [Uniform Fraudulent Transfer Act] provides that “[a]n obligation is incurred ... if evidenced by a writing, when the writing executed by the obligor is delivered to, or for the benefit of, the obligee.” Cal.Civ.Code § 3439.06(e)(2) [ (1997) ].
 

 NextWave IV.A,
 
 235 B.R. at 289 (ellipsis and second set of brackets in original).
 

 The obligation to pay the
 
 Notes
 
 attached upon their delivery, as the writing rule confirms, but that observation begs the crucial question: When did NextWave take on the obligation to pay $4.74 billion for what it bid at auction? And that question suggests another: What did Nex-tWave bid $4.74 billion to get?
 

 We conclude that NextWave bid $4.74 billion for the right — excluding other bidders — to be the qualified licensee of the Licenses, and became obligated to assure payment of $4.74 billion for the Licenses either by cash and credit on delivery or by submitting to liability for the shortfall if NextWave — which knew the rules for qualification — failed to qualify.
 

 Our ruling is based on the FCC’s interpretation of its own regulations, to which courts owe deference, but to which the courts below refused deference on grounds we conclude are invalid. The FCC’s interpretation is supported, in turn, by the auction law principle that an obligation attaches when the seller no longer can reject the bidder’s offer as a matter of discretion.
 
 [14]
 

 A. FCC Regulations
 

 The FCC’s rules establish the close of the auction as the time of obligation. The FCC’s formal interpretation of its own regulations, albeit issued after the auction, provides that the binding obligation to pay the full bid price attaches to the winning bidder “upon acceptance of the high bid.”
 
 In re Applications for Assignment of Broadband Personal Communications Services Licenses,
 
 FCC 98-301 (Dec. 23, 1998), 1998 WL 889489 (F.C.C.) ¶ 1. Other FCC publications clarify that the “acceptance of the high bid” occurs at the close of the auction: “Under the Commission’s rules, [the winning bidder] became obligated for its winning bid amounts when the
 
 *58
 
 auction closed.”
 
 Public Notice, Auction of C, D, E, and F Block Broadband PCS Licenses,
 
 DA-98-2604 (Dec. 23, 1998), 1998 WL 892962 (F.C.C.) at 4.
 

 The FCC’s interpretation enjoys a presumption of correctness: “We must give substantial deference to an agency’s interpretation of its own regulations.”
 
 Thomas Jefferson Univ. v. Shalala,
 
 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994);
 
 accord New York v. Shalala,
 
 119 F.3d 175, 182 (2d Cir.1997). It is not this Court’s task to choose which among several competing interpretations best serves the stated regulatory purpose; “the agency’s interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.”
 
 Thomas Jefferson Univ.,
 
 512 U.S. at 512, 114 S.Ct. 2381 (internal quotation marks omitted);
 
 accord New York v. Shalala,
 
 119 F.3d at 182. This Court defers to the agency’s interpretation unless a different reading is compelled by the plain meaning of the regulation or some other indicia of the agency’s intent at the time of promulgation.
 
 See Thomas Jefferson Univ.,
 
 512 U.S. at 512, 114 S.Ct. 2381. Deference is especially appropriate where “the regulation concerns ‘a complex and highly technical regulatory program.’”
 
 Id.
 
 (quoting
 
 Pauley v. BethEnergy Mines, Inc.,
 
 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991)).
 

 In this case, the FCC interprets its regulation to mean that NextWave’s obligation attached upon the close of the auction, and nothing justifies a departure from that interpretation. At the close of the auction NextWave became obligated, if qualified, to pay the $4.74 billion bid price or, if unqualified, to pay a prescribed penalty. The FCC’s penalty rules provide that default between the close of the auction and the grant of the Licenses exposes the winning bidder to liability for the amount it bid less the winning bid upon re-auction of the Licenses.
 
 See
 
 47 C.F.R. § 1.2104(g)(l)-(2). This “penalty” is the functional analog of expectation damages; that is, the FCC must mitigate its harm by a re-auction, but the original winning bidder is liable for any shortfall between the subsequent winning bid and its own. So although labeled a “penalty,” this remedy is fully consistent with the notion that the winning bidder becomes liable for full price of the winning bid upon the close of the auction.
 

 The bankruptcy court, however, held that it owed no deference to the FCC’s regulations or the Commission’s interpretation thereof because (a) the FCC appears in bankruptcy court as a creditor rather than as a regulator, and so is due no more deference than other creditor; and (b) the deference ordinarily afforded the FCC’s reading of its rules and the statute it administers is inappropriate (or at least not equally compelled) in this case by reason of the self-serving nature of the FCC’s post hoc interpretation.
 

 (a)
 
 The FCC’s Creditor Status.
 
 The bankruptcy court treated the FCC as a creditor like any other, and thus refused to allow the FCC to construe its contractual rights (after the fact) in a way that would be binding in the bankruptcy proceeding:
 

 [T]he FCC’s own regulations are entitled to no more nor less weight in the context of bankruptcy proceedings than the contractual notes, mortgages and similar documents required by other creditors in commercial transactions .... Stated simply, the FCC’s regulations,
 
 to the extent that they establish and govern the rights and obligations of the FCC and the licensee in their capacities as creditor and debtor,
 
 are subject to modification under the Bankruptcy Code, just like the contractual rights and obligations of an ordinary creditor vis a vis its debt- or.
 

 NextWave V,
 
 235 B.R. at 317 (emphasis added). This reasoning insufficiently accommodates the dual role that the FCC plays in this proceeding.
 
 See supra
 
 Part
 
 *59
 
 II. In granting licenses by auction, the FCC acts as creditor and regulator both. We need not decide what happens at each point of overlap, but the regulatory function is not ended by the bankruptcy of a licensee or license claimant, and as the function persists it must perforce be carried out.
 

 True, the FCC’s regulatory interpretation in this case favors the interests of the federal fisc over those of other NextWave creditors: It prevents the bankruptcy court from extinguishing approximately $3.7 billion of debt owed for the Licenses. It does not follow, however, that the FCC’s regulatory interpretation is proffered by the FCC as creditor only and not as regulator in whole or part. The FCC’s interpretation, which was rejected below as self-serving because it advances the FCC’s interest as creditor, also advances important regulatory purposes
 
 See supra
 
 Part II;
 
 Second Order
 
 ¶ 5;
 
 Restructuring Order
 
 ¶ 19.
 

 The bankruptcy court’s denial of deference to the FCC was premised on the understanding that the FCC was acting solely as a creditor in this action. Because the FCC was acting in part as a regulator as well as a creditor, we have no occasion to decide here whether the bankruptcy courts owe deference to the regulatory interpretations of agencies acting strictly as creditors. It is possible that in future proceedings the FCC may stand in a strict debtor/creditor relationship to NextWave. But since we do not know what steps the FCC will take vis-á-vis the obligations owed to it by NextWave, any issues created by the FCC’s attempts to collect on those obligations are not yet ripe.
 
 [15]
 
 Cf.
 
 Mountain Solutions, Ltd. v. FCC,
 
 197 F.3d 512 (D.C.Cir.)(holding that a request for injunctive relief, made by a bidder at a spectrum auction, was not ripe when the actual order imposing default penalties had not yet issued). We limit ourselves here to finding that NextWave’s obligations were incurred at the close of auction and that the transaction in which they were incurred was therefore not constructively fraudulent. Where the regulatory agency acts as both regulator and creditor, we owe deference to its interpretation of its regulations.
 

 (b)
 
 The FCC’s Self-Interest.
 
 The courts below emphasized and relied on the self-serving nature of the FCC’s interpretation and a perceived lack of connection between its interpretation and the original legislative purpose of the auction regime. We have already noted that the FCC’s interpretation, though financially advantageous to the federal government, also furthers regulatory goals. The financial benefits of the FCC’s post hoc interpretation do not extinguish the courts’ duty to give deference.
 

 The level of judicial deference depends in part on whether an agency interpretation is consistent or in conflict with the goals of the regulation as stated when it was adopted.
 
 See Thomas Jefferson Univ.,
 
 512 U.S. at 512, 114 S.Ct. 2381. As counsel for NextWave agreed at oral argument before us, one congressional goal in authorizing the FCC to conduct auctions was to achieve fair and efficient allocation of spectrum licenses.
 
 See
 
 Committee Report at 253,
 
 reprinted in
 
 1993 U.S.C.C.A.N. at 580;
 
 Second Order
 
 ¶73. The auction mechanism can do so only if the bids constitute a reliable index of the bidders’ commitments to exploit and make the most of the license at issue. And this goal is served only if the high bid entails
 
 *60
 
 the obligation to make good the amount bid, either by a qualified bidder’s payment on delivery or by payment of any shortfall (upon re-auction) by a bidder who fails to qualify. If the transaction can be adjusted in bankruptcy proceedings so that the high bidder takes the license without paying the amount of the high bid, the auction as a mechanism for determining valuation is impaired. The FCC’s insistence on full payment is consistent with the goals of the auction.
 

 B. Auction Law
 

 The parties and the bankruptcy court make several arguments based on the principles of auction law. We do not think it is necessary to rely on or to appear to create a federal common law of auctions in order to resolve this appeal. We think that the principles of auction law are useful nonetheless, at least insofar as they confirm and reinforce the rationality of the FCC’s interpretation of its regulations.
 

 The bankruptcy court held that NextWave gained nothing at the close of the auction except the right to apply for the Licenses, relying upon the following colloquy with counsel for the FCC:
 

 THE COURT: Wait a second. You’re asking for words, namely, “reasonably equivalent value” and that raises a question or value for what? And equivalent to what?
 

 [FCC]: To what they got.
 

 THE COURT: What did they get? [FCC]: What they got was the right to apply for these licenses that were essential to their business. And without those licenses, they would have no business.
 

 NextWave II,
 
 235 B.R. at 274. In summary of the court’s reasoning below (which summary may not do the analysis full justice): Delivery of the Licenses, notwithstanding the auction and NextWave’s high bid, remained contingent upon the FCC’s determination sometime later that NextWave’s application should be granted; the auction was therefore of the kind conducted with a reserve; like such reserve auctions, the high bidder’s obligation to pay did not arise when the hammer fell; the reserve in this case was not lifted until at least such time as the FCC decided to deliver the Licenses; and Nex-tWave’s obligation to pay the amount of the high bid therefore did not arise until the date on which the Licenses were delivered and the Notes delivered in exchange. We disagree. The close of the auction established the FCC’s obligation to grant NextWave the Licenses if the company fulfilled statutory eligibility requirements, and NextWave became liable at that time for full payment on the Licenses at the stated price.
 

 As in contract law more generally, a sale by auction is valid only upon offer and acceptance.
 
 See Blossom v. Railroad Co.,
 
 70 U.S. (3 Wall) 196, 206, 18 L.Ed. 43 (1865); 7
 
 Am.Jur.2d Auctions and Auctioneering
 
 § 20 (1997). As a baseline rule, the close of the auction— traditionally the drop of the hammer— signals acceptance of an offer and forms an enforceable contract.
 
 See
 
 7
 
 Am.Jur.2d Auctions and Auctioneering
 
 § 34; 7A
 
 C.J.S. Auctions and Auctioneers
 
 §§ 8, 12 (1980). A bidder has a right to withdraw the bid at any time before its acceptance.
 
 See Blossom,
 
 70 U.S. at 206; 7
 
 Am.Jur.2d Auctions and Auctioneering
 
 § 33; 7A
 
 C.J.S. Auctions and Auctioneers
 
 § 13. The timing of acceptance, and therefore of the creation of a contractual obligation, is different if the auction sale is conducted “with reserve”: ‘Where the seller reserves the right to refuse to accept any bid made, a binding sale is not consummated between the seller and the bidder until the seller accepts the bid.” 7
 
 Am.Jur.2d Auctions and Auctioneering
 
 § 20;
 
 see also Blossom,
 
 70 U.S. at 206; 7A
 
 C.J.S. Auctions and Auctioneers
 
 § 11.
 

 If by virtue of the required statutory approval, the FCC’s spectrum-allocation process became an “auction with reserve,” then (under the principles of auction law)
 
 *61
 
 NextWave’s obligation to pay would not have arisen until the FCC approved the grant of the Licenses to NextWave,
 
 after
 
 the drop in market value reflected in (or precipitated by) the auction of the D, E and F-blocks. The finding of constructive fraud rests on that analysis. On the other hand, if the obligation to pay or make good the winning bid arose when the winning bid was announced,
 
 before
 
 the drop in market value, then the obligation NextWave seeks to avoid cannot be characterized as a constructive fraud.
 

 We conclude that the obligations Nex-tWave seeks to avoid arose no later than the announcement of the winning bid, even though the resulting contract had more terms than would be common at the auction of a saleable thing by a private seller. By conducting the auction, the FCC offered to deliver the Licenses to the qualified high bidder. By bidding, NextWave represented that it was qualified to receive the Licenses. By making the high bid, NextWave (a) assumed an obligation to pay a down-payment promptly, (b) assumed an obligation to pay in the future the amount of its bid upon receipt of the Licenses and (c) assumed the risk that it might prove unqualified, by binding itself in that event to pay the amount of any shortfall in a re-auction of the same Licenses.
 

 The requisite statutory approval by the FCC was not a “reserve” that (until lifted) prevented any enforceable obligation on the part of the high bidder. Auctions with reserve stand or fall as a matter of the seller’s discretion, usually on the basis of the pecuniary sufficiency of the bids.
 
 See
 
 7
 
 Am.Jur.2d Auctions and Auctioneering
 
 § 23 (defining the phrase “without reserve” in terms of the seller’s right to “withdrawn the property from sale if he is not pleased with the bids”);
 
 see also Drew v. John Deere Co.,
 
 19 A.D.2d 308, 241 N.Y.S.2d 267, 269-70 (1963); 7
 
 Am.Jur.2d Auctions and Auctioneering
 
 § 21 (“[I]n an auction with a reserve, the auctioneer
 
 may
 
 withdraw the items for auction at any time until he announces completion of the sale.” (emphasis added)).
 

 The nature of the statutory approval requirement in this case is neither discretionary nor economic. The FCC’s act of naming NextWave the winning bidder obligated the FCC to deliver the Licenses to NextWave, at the price determined by NextWave’s winning bid, if NextWave fit certain non-economic qualifying criteria.
 
 See In the Matter of the Implementation of Section 309(j) of the Communications Act
 
 — Competitive
 
 Bidding, Fifth Report and Order,
 
 FCC 94-178, 9 F.C.C.R. 5532 (July 15, 1994), 1994 WL 372170 (F.C.C.) ¶ 81 (“If the Commission denies all petitions to deny, and is otherwise satisfied that the applicant is qualified, the license(s) will be granted to the auction winner.”); 47 C.F.R. § 1.2108(d)(1) (“If the Commission determines that ... an applicant is qualified ... it will grant the application.”). NextWave cites
 
 Mobile Communications Commission v. FCC,
 
 77 F.3d 1399 (D.C.Cir.1996), as demonstrating that the FCC has no obligation to grant the license at the bid-upon price.
 
 MCC v. FCC,
 
 however, dealt not with the FCC’s decision that a bid price was insufficient but with the FCC’s determination that the licensee was ineligible for a “pioneer’s preference” and thus had to pay for its license.
 
 See id.
 
 at 1408-09. The case is inapposite.
 

 NextWave knew about the statutory criteria for approval before the bidding began.
 
 See
 
 47 C.F.R. § 310(b)(4) (1991); 47 C.F.R. §§ 24.709, 24.712, 24.720 (1996). In the event, the only obstacle to closing encountered by NextWave was its own noncompliance with the foreign ownership requirements. NextWave’s willingness to bid notwithstanding the undisputed fact that non-compliance would prevent delivery of the Licenses and compel NextWave to insure the government against a lower high bid at re-auction demonstrates that NextWave assumed the risk of its own non-compliance.
 

 
 *62
 
 True, there appears to be an element of discretion in the FCC’s decision to grant the Licenses conditionally, pending Nex-tWave’s compliance with statutory requirements. However, that conditional grant was temporary,
 
 see In re Applications of NextWave Personal Communications, Inc. for various C-Block broadband PCS Licenses,
 
 DA 97-328 (Feb. 14, 1997), at 2, and the FCC had no power to waive the statutory requirements permanently. Moreover, it was a temporary discretionary
 
 approval;
 
 the FCC had no authority to
 
 reject
 
 NextWave’s bid as a matter of discretion.
 

 Thus the FCC was obligated to deliver the Licenses at the agreed-upon price if NextWave could demonstrate that it met certain statutory and regulatory eligibility requirements, and NextWave assumed the risk of its failure to do so. The FCC was bound, and so was NextWave. After acceptance of the offer, “as a rule, the seller has no right to accept a higher bid, nor may the buyer withdraw his bid.” 7
 
 Am. Jur.2d Auctions and Auctioneering
 
 § 20 (1997);
 
 see also Blossom,
 
 70 U.S. at 206.
 

 The FCC’s dual role in the licensing process — as offeror in the auction and as regulator thereafter — confers on the FCC prerogatives that are not enjoyed by the ordinary seller. The FCC thus retains the authority to reject a high bid for
 
 regulatory
 
 purposes. But NextWave knew, at the time of the auction, that the winning bidder would look to the FCC both as creditor and as regulator. If NextWave objected to the conditions imposed by the FCC or to the FCC’s dual role in the transaction, NextWave could have refrained from participating in the auction.
 

 The point is well illustrated in
 
 United States v. Weisbrod,
 
 202 F.2d 629, 633 (7th Cir.1953). In a surplus auction conducted near the end of World War II, the federal government reserved a unilateral right to withdraw from sale certain chemicals and drugs, even after accepting the winning bid.
 
 See id.
 
 at 630. When the government sued the winning bidder for default, the bidder defended on the ground that the contract was defective for failure of mutuality.
 
 See id.
 
 at 631. The Seventh Circuit affirmed the finding of liability for breach,
 
 see id.
 
 at 633, on the ground that a condition made known to the buyer — even the unilateral right of the seller to withdraw from the contract — did not abrogate the buyer’s obligation to perform.
 
 See id.
 
 at 632-33. “If one does not wish to bid ... with the conditions attached, his alternative is to make no bid.”
 
 Id.
 
 at 633.
 
 [16]
 

 CONCLUSION
 

 We hold that the bankruptcy and district courts had no power to interfere with the FCC’s system for allocating spectrum licenses and that, in any event, the courts erred in determining that NextWave’s payment obligation was constructively fraudulent. We therefore reverse the judgment of the district court affirming the five orders of the bankruptcy court and remand for further proceedings consistent with this opinion, if any are necessary. The mandate shall issue forthwith.
 

 [1]
 

 .
 
 In re NextWave Personal Communications, Inc.,
 
 235 B.R. 314 (Bankr.S.D.N.Y.1999) (June 16, 1999 decision denying motion to lift automatic stay)
 
 (NextWave
 
 V);
 
 NextWave Personal Communications, Inc. v. FCC (In re NextWave Personal Communications, Inc.),
 
 235 B.R. 277 (Bankr.S.D.N.Y.1999) (May 12, 1999 decision on fraudulent conveyance claim)
 
 (NextWave
 
 IV.A)
 
 as supplemented by NextWave Personal Communications, Inc. v. FCC (In re NextWave Personal Communications, Inc.),
 
 235 B.R. 305 (Bankr.S.D.N.Y.1999) (June 22,
 
 *46
 
 1999 decision on remedy)
 
 (NextWave
 
 IV.B);
 
 NextWave Personal Communications, Inc. v. FCC (In re NextWave Personal Communications, Inc.),
 
 No. 98-21529 (Bankr.S.D.N.Y. Apr. 2, 1999) (oral denial of FCC's motion to dismiss)
 
 (NextWave
 
 III);
 
 NextWave Personal Communications, Inc. v. FCC (In re NextWave Personal Communications, Inc.),
 
 235 B.R. 272 (Bankr.S.D.N.Y.1999) (Feb. 16, 1999 decision denying to FCC and granting to debtor partial summary judgment with regard to date upon which obligations were incurred)
 
 (NextWave
 
 II);
 
 NextWave Personal Communications, Inc. v. FCC (In re NextWave Personal Communications, Inc.),
 
 235 B.R. 263 (Bankr.S.D.N.Y.1998) (Dec. 7, 1998 decision granting in part and denying in part FCC’s motion to dismiss)
 
 (NextWave
 
 I).
 

 [2]
 

 . The C-block auctions ending July 16 involved licenses that became available when high bidders from the first auction defaulted on their initial down payments.
 

 [3]
 

 . As part of the FCC’s auction rules, bidders were required to deposit "qualifying amounts” in order to participate in the auction. NextWave deposited qualifying amounts of $79,225,000 on December 1, 1995 and $6,984,244 on June 13, 1996. On May 6, 1996 it was declared the winner of 56 of the Licenses, for which it deposited an additional $130,834,333 with the FCC. On July 16 it was named the winner of an additional seven Licenses, for which it deposited $20,138,825 on July 23. At the close of the bidding process, it had therefore deposited a total of $237,-182,402, or approximately five percent of its winning bids, with the FCC.
 
 See NextWave
 
 II, 235 B.R. at 273.
 

 [4]
 

 . The MHz, or megahertz of radio frequency, in question determines the carrying capacity of a block of wireless spectrum. The A, B, and C-block licenses consisted of 30 MHz of spectrum; the D, E, and F-blocks of 10. One "Pop” represents 1000 persons within the geographic area covered by a particular licensing block. $/MHz-Pop therefore measures the amount paid for a license that would allow the provision of a particular level of communications data to a particular number of people. NextWave's winning bids averaged at least $ 1.43/MHz-Pop, whereas the D, E, and F-block winning bids averaged $.33/MHz-Pop. The F-block auction, which like the C-block auction was reserved for qualified entities, produced winning bids that averaged only $.246/MHZ-pops.
 

 [5]
 

 . The bankruptcy court applied California, New York, and Washington, D.C. fraudulent conveyance law as the "applicable law,” holding that there was no substantive difference between the laws of the three jurisdictions.
 
 See NextWave
 
 IV..A, 235 B.R. at 288-89.
 

 [6]
 

 . Avoidance differs considerably from rescission. Rescission unwinds the transaction and restores the status quo ante, whereas avoidance allows the debtor to retain the benefit of its bargain while rewriting the debtor’s obligations under that same bargain.
 

 [7]
 

 . Section 309(j)(7)(A) specifically limits the degree to which the FCC can designate the generation of revenue as a factor in the “public interest,” demonstrating Congress’s intent that satisfaction of the FCA's objectives not be equated with income maximization. "[Tjhe Commission may not base a finding of public interest, convenience, and necessity on the expectation of federal revenues.” 47 U.S.C. § 309(j)(7)(A). “While Congress has charged [the FCC] to recover a portion of the value of the public spectrum made available via competitive bidding,” the process "does not amount to maximizing revenue, nor is it [the FCC’s] sole objective.”
 
 In the Matter of Implementation of Section 309(j) of the Communications Act
 
 — Competitive
 
 Bidding, Second Report and Order,
 
 FCC 94-61, 9 F.C.C.R. 2348 ¶ 73 (Apr. 20, 1994), 1994 WL 412167 (F.C.C.).
 

 [8]
 

 . "Designated entities” include "small businesses, rural telephone companies and women and minority-owned firms.” Second Order ¶ 6.
 

 [9]
 

 . The district court below held that the avoidance remedy requested by NextWave had "nothing to do with” the organization, execution, or implementation of the auctions.
 
 Nex-tWave Personal Communications, Inc. v. FCC (In re NextWave Personal Communications, Inc.),
 
 241 B.R.
 
 311
 
 (S.D.N.Y.1999).
 
 See
 
 infra at 36.
 

 [10]
 

 . The rules of construction included within § 309(j) reinforce this understanding. They say, "Nothing ... in the use of competitive bidding shall ... (C) diminish the authority of the Commission under the other provisions of this chapter to regulate or reclaim spectrum licenses." 47 U.S.C. § 309(j)(6)(C). In other words, even when they are
 
 allocated
 
 through the use of competitive bidding, spectrum licenses remain just that,
 
 licenses
 
 subject to regulation and reclamation by the FCC.
 

 [11]
 

 . The bankruptcy court held: "The basic defect in the FCC’s argument is that Congress did not confer upon the FCC the power to determine unilaterally its own rights as a creditor in competition with and to the detriment of other creditors.”
 
 NextWave I,
 
 235 B.R. at 270. That is surely true. But as we have repeatedly stated, that analysis is misplaced if it allows the bankruptcy court to adjudicate claims against the FCC not as a creditor, but as an allocator of licenses. Such was the case here. As for NextWave’s other creditors, jurisdiction in the bankruptcy and district courts is not created by any interest these creditors might have in NextWave retaining but avoiding payment on the Licenses.
 

 [12]
 

 . Because the consequences of constructive fraud are not limited to 11 U.S.C. § 544, we believe appellate consideration of this holding is necessary.
 

 [13]
 

 . Both NextWave and the FCC concede that any choice-of-law questions as to the fraudulent conveyance issue are obviated by the coincidence of § 548, on the one hand, and the applicable New York, California, and Washington, DC laws, on the other.
 
 See NextWave IV.A,
 
 235 B.R. at 289.
 

 [14]
 

 . Because we believe there are adequate other grounds for reversing the courts below in this case, and because we think the FCC has provided us with a rational interpretation of its regulations that warrants our deference, we do not reach the question of whether federal common law governs auctions conducted pursuant to the FCA in the absence of satisfactory statutory or regulatory guidance. If we were to apply federal common law, it would not be "federal common law in the strictest sense, i.e., a rule of decision that amounts, not simply to an interpretation of a federal statute, but, rather, to the judicial 'creation' of a special federal rule of decision,"
 
 Burlington Indus., Inc. v. Ellerth,
 
 524 U.S. 742, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998)(internal citations and ellipses omitted) (citing
 
 Atherton v. FDIC,
 
 519 U.S. 213, 218, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997)), and federal courts often employ federal common law "principles" in interpreting federal statutes.
 
 See, e.g., Burlington
 
 at 2269-70 (agency);
 
 United States v. Bestfoods,
 
 524 U.S. 51, 118 S.Ct. 1876, 1886 n. 9, 141 L.Ed.2d 43 (1998) (discussing veil piercing under CERCLA). In the present case, however, we content ourselves with reviewing and rejecting the conclusions that NextWave claims to draw from the principles of auction law. We refrain from engaging in the kind of "willful policymaking, pure and simple,”
 
 Burlington
 
 at 2273 (Thomas, J., dissenting), that might result from drawing intuitively on purported common law "principles.”
 
 See Id.
 
 at 2273 (decrying use of "agency principles” drawn entirely from Restatement (Second) of Agency).
 

 [15]
 

 . This appeal stems from an adversary proceeding initiated preemptively by NextWave. Because of the ongoing litigation, the FCC has not yet sought to take any action vis-a-vis the Licenses. While it would probably be fair to assume that the FCC will seek to revoke the Licenses and collect on its debts, we cannot presume to know in advance the course that the agency will ultimately follow. We do not know, for example, the size of the penalty the FCC may seek to recover, or even whether it will seek to recover its regulatory penalty, recover on the Notes, or recover on both. It is possible that if the FCC chooses to pursue some of these options — say, collection on the Notes — it may find itself acting as a creditor.
 

 [16]
 

 . Cases cited by NextWave to support the contrary argument, which concern auctions with reserve, are not on point.
 
 See, e.g., Erie Coal & Coke Corp. v. United States,
 
 266 U.S. 518, 520-21, 60 Ct.Cl. 1022, 45 S.Ct. 181, 69 L.Ed. 417 (1925);
 
 Ferry v. Udall,
 
 336 F.2d 706, 709 (9th Cir.1964).