In re PERSONAL COMMUNICATIONS NETWORK, INC., Debtor.

No. 199–20207–575.

United States Bankruptcy Court,
E.D. New York.

June 7, 2000.

United States Department of Justice, by J. Christopher Kohn, Sandra P. Spooner, Lloyd H. Randolph, Civil Division, U.S. Department of Justice, Washington, D.C., David W. Ogden, Acting Assistant Attorney General, Loretta Lynch, Acting United States Attorney for the Eastern District of New York, Rosanne M. Harvey, Assistant United States Attorney, Brooklyn, NY, for the United States.

Ballon Stoll Bader & Nadler, P.C., by Chris Mularadelis, Dwight Yellen, New York City, for Debtor.

Morrison Cohen Singer & Weinstein, LLP, by Thomas R. Califano, New York City, for PCN Acquisition Corp.

## OPINION ON UNITED STATES' MOTION FOR DETERMINATION THAT FCC LICENSES ARE NOT PART OF DEBTOR'S ESTATE

LAURA TAYLOR SWAIN, Bankruptcy Judge.

On January 12, 2000, the United States initiated the instant contested matter by filing its Motion for Determination That FCC Licenses Are Not Part of Debtor's Estate (the "Motion"). In connection with the Motion, Debtor and the United States entered into a Joint Fact Stipulation dated January 11, 2000 (the "Joint Fact Stipula-

tion"). The Court heard argument on the Motion at a March 8, 2000 hearing, and thereafter directed the parties to file supplemental briefs.

The United States seeks a determination that certain licenses issued by the Federal Communications Commission ("FCC") to debtor Personal Communications Network, Inc. ("PCN" or "Debtor") are not part of Debtor's bankruptcy estate and requests that the Court, in furtherance of such determination, direct Debtor to amend its schedules to delete all references to the subject licenses. Debtor contends that it retained an equitable and legal interest in the licenses as of the date Debtor filed its chapter 11 petition.

The Court has jurisdiction of this core proceeding pursuant to 28 U.S.C. sections 157(b)(2)(A), (O) and 1334(b) and the general Order of reference, dated August 28, 1986, of the United States District Court for the Eastern District of New York. There are no material disputed facts. For the reasons set forth below, the Court finds that the United States is entitled as a matter of law to the relief it seeks. The United States' Motion is, accordingly, granted.

### BACKGROUND

The following material facts are undisputed.[1] In 1993, Congress authorized the Federal Communications Commission (the "FCC") to auction exclusive licenses to use portions of the radio spectrum for Broadband Personal Communication Services ("PCS"), a type of wireless telecommunications service. The FCC divided the PCS radio spectrum into bandwiths of various sizes, or "blocks," and has put the blocks up for auction at various times. Pursuant to Congressional directive, the FCC reserved a portion of the PCS spectrum for licensing to "small businesses." One of the spectrum blocks reserved for small businesses was known as the "C Block." The FCC granted "bidding credits" in the

---

1. The uncontested facts are set forth more fully in the parties' Joint Fact Stipulation.

amount of 25% of the winning bids (apparently a 25% reduction of the face value of the bid amount) to qualifying small businesses that were successful bidders and also permitted such small businesses to elect to pay 90% of their bids in installments over ten years.

From December 1995 to May 6, 1996, the FCC conducted an auction of the C Block. PCN submitted bids for a total amount of $35,269,600 for six C Block licenses. After application of the bidding credits available to PCN, PCN's bid amounted to $26,452,200. On May 8, 1996, the FCC declared PCN the winning bidder of these six C Block licenses. On September 17, 1996, pursuant to its authority under the Communications Act of 1934, the FCC awarded the six licenses to PCN. PCN elected to satisfy its obligation to pay $26,452,200 for the six licenses in installments. PCN completed its down payment in September 1996. PCN subsequently issued promissory notes in the aggregate amount of $23,806,980 in respect of its obligation to pay the remaining amount of its bid for the six licenses. PCN also executed a security agreement in favor of the FCC in connection with each of the notes.

In March 1997, the FCC suspended C Block installment payments in response to problems C Block licensees had encountered in meeting their payment obligations. The FCC subsequently offered to restructure the obligations of the C Block licensees, including PCN. Pursuant to the restructuring plan offered by the FCC, PCN agreed to give up its rights to use half of the spectrum covered by the six licenses and the FCC agreed to reduce PCN's payment obligation by half. The FCC thereupon issued six new licenses to PCN (the "Licenses"). PCN elected to make payments for the Licenses in installments. The reduced payment obligations under the Licenses were set forth in certain modifications to the original installment payment notes. The security

agreements executed under the original six licenses remained in effect.

Under applicable FCC regulations, the Licenses and the notes (as modified), PCN was required to make quarterly installment payments. The first installment payment was due on July 31, 1998. PCN made the July 31, 1998 payment on October 29, 1998. An additional payment was due on October 31, 1998. PCN made the October 31, 1998 payment on January 28, 1999.

In connection with the payment due on January 31, 1999 (which remains unpaid), the FCC sent PCN six "Payment Notices" dated July 20, 1999, each stating in pertinent part as follows:

> Any entity that is more than 180 days delinquent in making an installment payment or fails to pay any associated late fees 'will be declared in default, its license will automatically cancel and will be subject to debt collection procedures' [citation omitted].

> ... If the January 31, 1999 installment and suspension interest (if applicable) payments and applicable late fees, are not received by the [FCC], on or before July 30, 1999, the license will automatically cancel and the promissory note will be subject to debt collection procedures.

Exhibit 5 to Joint Fact Stipulation at 6. Between the date the January 31, 1999 payment was due and July 30, 1999, the FCC did not send PCN any other written notice that Licenses would automatically cancel on July 30, 1999 for nonpayment. PCN has made no further payments.

The FCC's regulations provide for certain grace periods in connection with license payments due under the FCC's installment payment plan. Prior to October 29, 1998, PCN requested a grace period and the waiver of certain default provisions. The FCC denied PCN's request. PCN made no other requests for waiver or extensions of grace periods for making its installment payments.

Each of the Licenses contains the following condition:

This authorization is conditioned upon the full and timely payment of all monies due pursuant to Sections 1.2110 and 24.711 of the [FCC's] Rules and the terms of the [FCC's] installment plan as set forth in the Note and Security Agreement executed by the licensee. Failure to comply with this condition will result in automatic cancellation of this authorization.

Federal Communications Commission Wireless Telecommunications Bureau Radio Station Authorization, dated September 7, 1999 (Exhibit 3 to Joint Fact Stipulation).

47 C.F.R. § 1.2110(f)(4) (1998) provides: A license granted to an eligible entity that elects installment payments shall be conditioned upon the full and timely performance of [the entity's] payment obligations under the installment plan.

PCN filed its Chapter 11 bankruptcy petition on August 6, 1999, seeking to reorganize its affairs by making arrangements to pay at least some of the amounts due to the FCC and retaining the Licenses. Debtor's schedules identify the Licenses as property of its estate.

*DISCUSSION*

*Review of the FCC's Licensing Decisions*

■ The FCC interprets its regulations and the terms of the Licenses to mean that the C Block licenses automatically cancel upon the failure of a license condition. *See In the Matter of Requests for Extension of the Commission's Initial Non–Delinquency Period For C and F Block Installment Payments,* WT Docket No. 97–82, Order, FCC 98–290, 13 FCC Rcd. 22071, 14 Communications Reg. (P & F) 172, 1998 WL 754808 (October 29, 1998) (finding that licensees failing to make payment deadlines were subject to automatic cancellation of the licenses); *In the Matter of Request for Extension of the Commission's Initial Non–Delinquency Period for C and F*

*Block Installment Payments,* WT Docket No. 97–82, Memorandum Opinion and Order, FCC 99–62, 14 FCC Rcd. 6080, 1999 WL 181805 (April 2, 1999) (affirming FCC's determination that licenses will automatically cancel if payment deadline missed).

It is undisputed that PCN did not make the January 31, 1999 installment payment. Under the express terms of the FCC regulations governing installment payments, PCN's failure to make the January 1999 payment resulted in the failure of the condition which entitled PCN to retain the Licenses. Under the FCC's interpretation of the language of the C Block licenses and the regulations promulgated by the agency, the Licenses cancelled automatically, pre-petition, when PCN failed to tender payments within the applicable period.

■ The United States Court of Appeals for the Second Circuit has made clear that this Court lacks jurisdiction to review the FCC's determination in this regard: "[T]he FCC's licensing decisions are subject to the exclusive jurisdiction of the federal courts of appeals and outside the limited jurisdiction of the bankruptcy court." *In re Federal Communications Commission,* No. 99–5063, slip op. at 5–6 (2d Cir. May 25, 2000) (*"Nextwave III "*); *In re Nextwave Personal Communications, Inc.,* 200 F.3d 43 (2d Cir.1999) (*"Nextwave II "*).

In *Nextwave II,* the Second Circuit determined that Congress had authorized the FCC to auction portions of the PCS radio spectrum as a means of distribution to those entities most likely to put them to best use. *Nextwave II,* 200 F.3d at 51. The Second Circuit found that the auction of portions of the PCS radio spectrum constitutes "a regulatory tool for ensuring that licenses are distributed in the way that fulfills the goals of the Federal Communications Act." *Id.* at 53. Having found that the auction of the PCS radio spectrums serves a regulatory purpose, the Second Circuit held that the FCC has exclusive jurisdiction over the granting of

spectrum licenses and the conditions of their use:

It is beyond the jurisdiction of a court in a collateral proceeding to mandate that a licensee be allowed to keep its license despite its failure to meet the conditions to which the license is subject.

*Id.* at 54.

In *Nextwave II,* the Second Circuit held that full payment of a winning bid was a condition for the retention of the licenses by successful bidders. In *Nextwave III,* its subsequent opinion on the FCC's writ of mandamus in connection with the *Nextwave* bankruptcy case, the Second Circuit held that the bankruptcy court did not have jurisdiction to review the "FCC's enforcement of the payment schedule established by its regulations, orders and decisions." *Nextwave III,* slip op. at 32.

Debtor argues that the FCC's interpretations of the terms of the Licenses and applicable regulations are faulty, and that automatic revocation of the Licenses is violative of PCN's due process rights. The relevant limitations on this Court's jurisdiction are, however, clear. This Court is without power to review the propriety of the FCC's conclusion that Debtor's Licenses were revoked automatically upon Debtor's failure to meet the conditions imposed by the FCC for retention of the Licenses. *See Nextwave II,* 200 F.3d at 54. PCN's arguments, which amount to collateral attacks on the FCC's regulatory decisions with respect to the allocation and the terms of C Block licenses, concern matters that Congress has committed to the exclusive jurisdiction of the federal courts of appeals under 28 U.S.C. § 2342 and 47 U.S.C. § 402. *See Nextwave III,* slip op. at 31.

*Property of the Estate*

The FCC contends that, because the Licenses automatically cancelled prior to the commencement of Debtor's bankruptcy estate, the Licenses are not property of the estate under Section 541 of the Bankruptcy Code (11 U.S.C. § 541). The nature of the property interests a debtor brings to a bankruptcy estate is determined in accordance with applicable nonbankruptcy law. *Official Committee of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines, Inc.),* 928 F.2d 565, 569 (2d Cir.1991). Here, the terms of the Licenses and rights with respect to use of the PCS radio spectrum are statutorily committed to the exclusive jurisdiction of the FCC. *Nextwave II,* 200 F.3d at 54. As noted above, the FCC has determined that the Licenses automatically cancelled prepetition, a determination this Court has no jurisdiction to disturb and to which it must defer. *Id.* at 54–55. Accordingly, the Licenses having cancelled prepetition, PCN brought no ownership rights in respect of the Licenses to the bankruptcy estate, and the United States' request for an order requiring amendment of Debtor's schedules should be granted. *See* Fed. R. Bankr.Proc. 1009(a).

### CONCLUSION

The FCC, which has exclusive regulatory power over the allocation and licensing of the spectrum rights at issue here, has determined that the six Licenses issued prepetition to PCN cancelled automatically, prepetition, upon PCN's failure to make timely payments in respect of its winning bid for those Licenses. This Court has no jurisdiction to review the propriety of that determination and must defer to the FCC's interpretation of the terms of the Licenses and the FCC's regulations in determining whether PCN had any ownership interest in the Licenses that became property of the estate within the meaning of Section 541 of the Bankruptcy Code (11 U.S.C. § 541). The Court finds that the Licenses are not property of the estate and that, accordingly, Debtor's schedules should be amended to the extent they identify ownership interests in the Licenses as property of the estate.

The Court will enter an order consistent with this opinion.