**In re KANSAS PERSONAL COM-MUNICATION SERVICES, LTD., Debtor.**

**No. 99–21747–11–JAR.**

United States Bankruptcy Court, D. Kansas.

Aug. 16, 2000.

**182**

Benjamin F. Mann and Nancy S. Jochens, Blackwell, Sanders, Peper, Martin LLP, Kansas City, MO, for Debtor.

Samuel P. Logan, Logan Law Firm LLC, Olathe, KS, for ACRS Construction Company, Inc., Associated Communications & Research Services.

Richard A. Wieland, Office of U.S. Trustee, Wichita, KS, for U.S. Trustee and Internal Revenue Service.

Angela D. Gupta, Margaret M. Newell, Melanie D. Caro, Topeka, KS, for Office of the United States Attorney.

### MEMORANDUM OPINION AND ORDER DENYING MOTION FOR AMENDMENT OF SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS AND TO STRIKE REFERENCES TO PCS LICENSES

JULIE A. ROBINSON, Bankruptcy Judge.

This matter comes before the Court on the motion of the Federal Communications Commission ("FCC") for an order requiring the Debtor Kansas Personal Communication Services, Ltd. ("KPCS") to amend its bankruptcy schedules and statements to strike all references to FCC licenses. The FCC has used this motion to raise the fundamental question of whether the FCC licenses are property of KPCS's bankruptcy estate. This Court concludes that they are.

### FACTUAL BACKGROUND

In 1993, Congress enacted § 309(j) of the Federal Communications Act, authorizing the FCC to replace its existing systems for licensing the electromagnetic spectrum, lotteries, and comparative hearings, with an auction process.[1] This legislation included rules that fostered competition and provided an opportunity for small businesses and entrepreneurs to compete in the wireless marketplace. The FCC used competitive auctions to allocate licenses to use the public spectrum for Broadband Personal Communication Services ("PCS"), a new type of wireless telecommunications service. The FCC divided

---

1. 47 U.S.C. § 309(j)(1) and (3).

the PCS spectrum into six blocks—A through F—and designated the auctions for licenses in the C block for small business participation, permitting high bidders, after an up-front deposit, to pay the amounts due on an installment basis.

KPCS was the winning bidder on three C block licenses auctioned by the FCC in 1996 ("Licenses"). Under the terms of the FCC rules, KPCS was required to make two up-front payments, 10 percent of its bid amount, payable at the time of the conditional award of the license, and another 10 percent payable at the time of the grant of the Licenses. These payments served to demonstrate the licensee's financial ability. KPCS opted to pay for the Licenses under a ten-year installment plan authorized and started by the FCC. For each of its three Licenses, KPCS executed a Note and Security Agreement.

When a number of the successful bidders in the C block auction had difficulty meeting their payment obligations under the installment plan, the FCC responded by entering Restructuring Orders, modifying the rules concerning installment payments.[2] The Restructuring Orders gave the licensees four options: (1) relinquishment of half of the PCS spectrum with a corresponding reduction in outstanding debt; (2) amnesty, or relinquishment of the licenses to the FCC in return for forgiveness of all outstanding debt; (3)surrender of some licenses, with application of 70% of the down payment on the surrendered licenses toward prepayment of any retained licenses; or (4) retention of the licenses, with resumption of the original payment terms and obligations, but with modified payment schedules.

KPCS, which had last made an installment payment in October 1998, chose the fourth option. It retained its three Licenses, with resumption of the original

payment terms and obligations, but with a modified payment schedule. The modified payment schedule did not alter the language providing for automatic cancellation of the licenses upon the Debtor's failure to pay according to the payment schedule.

KPCS failed to make its quarterly installment payment on the Licenses on the January 31, 1999 due date. However, FCC regulations provided for two 90–day grace periods, such that KPCS had until July 30, 1999, to make its quarterly payment.

The Notes and Security Agreements[3] signed by KPCS in favor of the FCC define default and the remedies for default. The Note includes the following language:

> This authorization is conditioned upon the full and timely payment of all monies due pursuant to Sections 1/2110 and 24/711 of the Commission's Rules and the terms of the Commission's installment plan as set forth in the Note and the Security Agreement executed by the licensee. Failure to comply with this condition will result in automatic cancellation of this authorization.

The Security Agreement also addresses remedies in the event of default, stating:

> 8. *Remedies.* If an Event of Default shall occur, the Commission shall thereafter have the following rights and remedies (to the extent permitted by applicable law) in addition to the rights and remedies relating to the Note, all such remedies being cumulative, not exclusive, and enforceable alternatively, successively or concurrently at such time or times as [the] Commission deems expedient:
>
> (a) the License shall be automatically canceled pursuant to 47 C.F.R. § 1.2110;

---

**2.** A detailed account of the procedural history of the Restructuring Orders is described in the Second Circuit Court of Appeals decision *In re NextWave Personal Communications, Inc.,* 200 F.3d 43 (2d Cir.1999), quoted *infra.*

**3.** Attached to the "Declaration of Mark Reger Supporting Motion for Amendment of the Schedules and Statement of Financial Affairs to Strike References to PCS Licenses".

(b) all Obligations secured hereunder shall become immediately due and payable without presentment, demand, protest, further notice, or other requirements of any kind;

(c) the Commission may demand, sue for, and collect the outstanding balance of the unpaid Obligations, and make any compromise, or settlement the Commission deems suitable with respect to any Collateral which may be held by it hereunder;

. . . .

(g) Secured Party may exercise any and all of the rights and remedies conferred upon Secured Party by this Agreement, any other loan documents, or by applicable law, either concurrently or in such order as Secured Party may determine.

. . . .

(i) the Commission may exercise any remedies of a Secured party under the Uniform Commercial Code. . . .

(j) Secured Party shall have the right to enforce one or more remedies hereunder or under the Note, successively or concurrently, and such action shall not operate to estop or prevent Secured Party from pursuing any further remedy which it may have.

On July 19, 1999, before the July 30 deadline, an involuntary bankruptcy petition was filed against KPCS. On August 4, 1999, this Court granted KPCS's motion to convert the case to Chapter 11 and entered an Order for Relief. KPCS listed the PCS Licenses on its schedule of assets, and further identified the Licenses as

property subject to a lien securing the FCC's claim.

To date KPCS has made no further installment payments on the Licenses. KPCS has filed a plan and the Court has approved the disclosure statement, with certain modifications. The Court has not yet held a confirmation hearing.

### CONCLUSIONS OF LAW

### PCS Licenses are Property of the Bankruptcy Estate.

█ "Property of the estate" is defined in 11 U.S.C. § 541[4] as "all legal or equitable interests of the debtor in property as of the commencement of the case."[5] Section 541 is broadly construed.[6] As a general rule, the nature and extent of legal and equitable interests in property are determined by state law, or applicable non-bankruptcy law.[7]

█ PCS Licenses issued by the FCC constitute property of the licensee's bankruptcy estate.[8] Although the FCC argues that the Licenses were automatically canceled on or about July 30, 1999, it apparently concedes that the Licenses were property of KPCS's estate on July 19, 1999, when the case was filed. In the State Street Bank[9] case, the FCC expressly acknowledged that a licensee has a limited property interest in a cellular broadcasting license.

█ In fact, the FCC, by taking a security interest in the Licenses, acknowledged that KPCS had a property interest or rights in the Licenses to which a security interest could attach. The Security Agreement states that its provisions shall

---

4. All references are to Title 11 of the United States Code unless otherwise indicated.

5. § 541(a)(1).

6. United States v. Whiting Pools, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

7. Butner v. United States, 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (holding that property interests are created and defined by state law).

8. See e.g., In re Central Arkansas Broadcasting Company, 68 F.3d 213, 214 (8th Cir.1995) (interests of debtor in FCC license property of the estate); In re Tak Communications Inc., 985 F.2d 916 (7th Cir.1993).

9. State Street Bank & Trust v. Arrow Communications, Inc., 833 F.Supp. 41, 47 (D.Mass. 1993).

be interpreted under the Uniform Commercial Code. Under the Uniform Commercial Code, the debtor must have rights in the collateral before a security interest can attach.[10]

██ Given that "property of the estate" is defined by the debtor's legal and equitable interests as of the date the case is filed,[11] the Licenses were property of the estate on July 19, 1999. On July 19, 1999, KPCS had, under the grace period allowed by the FCC, until July 30, 1999, to make an installment payment. For this reason, the instant case is distinguishable from a case cited by the FCC, *In re Personal Communications Network, Inc.*[12] In that case, by the time the FCC licensee filed bankruptcy, the grace period had expired, and that court held that the licenses were automatically revoked prepetition.

### The Automatic stay precluded cancellation of licenses postpetition.

The FCC argues that when KPCS failed to make the installment payment on July 30, 1999, the Licenses were automatically canceled, albeit postpetition. Although not mentioned by the parties, the Court begins its analysis with § 108, which states in pertinent part:

> (b) Except as provided in subsection (a) of this section, **if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the**

debtor or an individual protected under section 1201 or 1301 of this title **may** file any pleading, demand, notice, or proof of claim or loss, **cure a default,** or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—

> (1) the **end of such period,** including any suspension of such period occurring on or after the commencement of the case; or (2) **60 days** after the order for relief. (emphasis added).

██ Section 108 is a general provision under the Bankruptcy Code, designed to give the trustee or debtor in possession an extension of time for filing an action or doing some other act that is required to preserve the debtor's rights.[13] But, § 108(b) is not applicable to time periods in actions against the debtor that are stayed by § 362(a), because § 108 does not render § 362 a nullity. Section 108(b) does not supplant the protections of the automatic stay, however, and only applies to actions that are not otherwise stayed.[14]

The FCC argues that the Licenses were canceled automatically, without any "action or proceeding" or "act" by the FCC, as contemplated in § 362. The FCC references language in two sections of § 362(a) that define what conduct comes within the

---

**10.** K.S.A. § 84–9–203(1)(c).

**11.** Section 303(b) states that an involuntary case "is commenced by the filing of a petition" by the requisite number of eligible entities and further, § 303(g) provides a procedure for preservation of "the property of the estate" if at any time between "the commencement of an involuntary case" and the entry of the order for relief the court finds it necessary to preserve such property. This indicates that the scope of the estate is defined as of the time the involuntary petition is filed, despite the debtor's freedom to possess, control and dispose of property during the gap period.

**12.** 249 B.R. 233 (Bankr.E.D.N.Y.2000).

**13.** *Autoskill v. National Educational Support Systems,* 994 F.2d 1476, 1485–86 (10th Cir.), *cert. denied,* 510 U.S. 916, 114 S.Ct. 307, 126 L.Ed.2d 254 (1993)(recognizing that where an appeal was not stayed by § 362(a), § 108(b) gave the debtor or trustee an extension of time to file a notice of appeal).

**14.** Nor does § 108(b) supplant the specific Code provisions that give debtors or trustees the power to cure defaults or modify creditors' rights, or to assume or reject executory contracts *Moody v. Amoco Oil Co.,* 734 F.2d 1200 (7th Cir.) *cert. denied,* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984)(provisions in § 365 to cure default in lease or executory contract are not supplanted by § 108(b)).

scope of the automatic stay. Section 362(a) provides that a bankruptcy filing:

> ... operates as a stay, applicable to all entities, of—
>
> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other **action or proceeding against the debtor** that was or could have been commenced before the commencement of the case under this title,
>
> . . . .
>
> (3) any **act** to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. (emphasis added).

■ The Court agrees that the FCC did not commence an action or proceeding against KPCS prepetition; and because the grace period had not expired, the FCC could not have commenced an action or proceeding against KPCS prepetition. Thus, § 362(a)(1) does not apply to stay the FCC's post petition cancellation of the Licenses. Conversely, § 362(a)(3) does apply, for a cancellation of the Licenses by the FCC would be an act to exercise control over the Licenses, which are property of the estate.

The FCC argues cancellation is not an "act" because cancellation involves no conduct by the FCC. Rather, on July 30, 1999, under the terms of the regulations, Licenses, Note and Security Agreement, the FCC contends the Licenses canceled without any affirmative conduct by the FCC, and the FCC lacked discretion to extend, modify or halt the cancellation.

In the *Yellow Cab* [15] case, the Tenth Circuit Court of Appeals determined that the governmental entity's conduct was stayed under either § 362(a)(1) or (a)(3).

The conduct at issue was a decision by the Colorado Public Utilities Commission denying the debtor's application to transfer certificates allowing the operation of 600 cabs in the Denver area. This decision was made after a hearing and recommendations by an administrative law judge. In contrast, the FCC argues, in this case there was no hearing, no decision, no determination of any kind. Simply put, as of July 30, 1999 the Licenses expired by their terms.

The FCC analogizes these facts to those in the *In re Gull Air, Inc.* [16] In that case, the FAA had allocated four arrival and departure slots at LaGuardia Airport to the debtor airline. The FAA's regulations mandated that the airlines use the slots, or be subject to the FAA's withdrawal and reallocation of the slots, called the "use or lose" provision. When the debtor filed bankruptcy, it ceased using the slots. The FAA regulations provided a 60–day grace period, such that for the first 60 days after filing its petition, the debtor was exempted from complying with the use or lose provision. When this 60–day grace period expired, the debtor did not commence using the slots. The debtor argued that the FAA could not withdraw the slots, because § 362(a)(3) stayed such an act to obtain possession of the slots. The First Circuit Court of Appeals rejected the debtor's argument, concluding that the FAA's withdrawal of the slots was automatic and mandatory under the FAA regulations. The applicable regulation [17] stated that slots "... shall be recalled by the FAA for non-use." The court reasoned that withdrawal required no affirmative act by the FAA, and the FAA lacked discretion to not recall the slots. Therefore, the court held, "Gull Air's interest in the slots thus terminated by force or regulation with no need for affirmative action by the FAA." [18]

---

**15.** *Yellow Cab Coop Ass'n v. Metro Taxi, Inc. (In re Yellow Cab Coop. Ass'n),* 132 F.3d 591 (10th Cir.1997).

**16.** *Federal Aviation Administration v. Gull Air, Inc. (In re Gull Air, Inc.),* 890 F.2d 1255, 1260 (1st Cir.1989).

**17.** 14 C.F.R. 93.227(a) (1989).

**18.** 890 F.2d at 1260.

But this case is distinguishable from Gull Air. The FCC's argument that it lacked discretion or authority to modify or amend the cancellation provision is not supported by the statute or the regulations, nor by the FCC's procedural history in dealing with the C block PCS licensees. The statute, 47 U.S.C. 309(j), gives the FCC broad authority to allocate PCS licenses through a system of competitive bidding, and broad discretion in fashioning its methodology. The statute directs the FCC to promote certain objectives, including:

(A) the development and rapid deployment of new technologies, products, and services for the benefit of the public, including those residing in rural areas, without administrative or judicial delays;

(B) promoting economic opportunity and competition and ensuring that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women;

(C) recovery for the public of a portion of the value of the public spectrum resource made available for commercial use and avoidance of unjust enrichment through the methods employed to award uses of that resource;

(D) efficient and intensive use of the electromagnetic spectrum; .... [19]

To that end, the statute directs the FCC to promulgate regulations that accomplish these objectives, including:

(4) Contents of regulations

In prescribing regulations pursuant to paragraph (3), the Commission shall—
(A) consider alternative payment schedules and methods of calculation, including lump sums or guaranteed install-ment payments, with or without royalty payments, or other schedules or methods that promote the objectives described in paragraph (3)(B), and combinations of such schedules and methods;

(B) include performance requirements, such as appropriate deadlines and penalties for performance failures, to ensure prompt delivery of service to rural areas, to prevent stockpiling or warehousing of spectrum by licensees or permittees, and to promote investment in and rapid deployment of new technologies and services;

(C) consistent with the public interest, convenience, and necessity, the purposes of this chapter, and the characteristics of the proposed service, prescribe area designations and bandwidth assignments that promote (i) an equitable distribution of licenses and services among geographic areas, (ii) economic opportunity for a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women, and (iii) investment in and rapid deployment of new technologies and services; .... [20]

■ From this broad mandate, the FCC promulgated a number of regulations, including 47 C.F.R. § 1.2110(f)(4)(iv), which states:

Any eligible entity that submits an installment payment after the due date but fails to pay any late fee, interest or principal at the close of the 90–day non-delinquency period and subsequent automatic grace period, if such a grace period is available, will be declared in default, its license will automatically cancel, and will be subject to debt collection procedures.

This language indicates that cancellation occurs when the FCC has "declared" a default. A declaration of default is an affirmative act.

---

**19.** 47 U.S.C. 309(j)(3).

**20.** 47 U.S.C. 309(j)(4).

The automatic cancellation language is also found in the FCC's Notes and Security Agreements. The Note states that failure to comply with the installment plan will result in automatic cancellation; but, the Security Agreement gives the FCC discretion and authority to choose its remedies in the event the licensee defaults in payments. The Security Agreement states that upon default, the FCC may resort to a number of rights and remedies, which are "cumulative, not exclusive, and enforceable alternatively, successively, or concurrently at such time or times as the Commission deems expedient."

In this respect, the FCC is like any other lender. It has the discretion to choose from the remedies provided in its Note and Security Agreement. Under the terms of its Security Agreement, the FCC can choose to automatically cancel the Licenses, sue on the Note, and/or exercise any of the remedies of a secured party under the UCC. The language in the FCC's Note and Security Agreement belies its argument that it lacks discretion to modify or cease the cancellation of Licenses.

Moreover, the history of the beleaguered C block licensees and the FCC's response to the outcry of those licensees evidences the discretionary authority of the FCC. This history is detailed by the Second Circuit Court of Appeals in *NextWave:* [21]

The C-block auctions were part of a series of auctions the FCC conducted to allocate spectrum for new technological uses. Prior to the C-block auctions, it had conducted the A and B-block auctions, and in June 1996 it announced that it would conduct the D, E and F-block auctions starting on August 26, 1996. The winning bids at the A, B, D, E and F-block auctions were sharply lower than the winning bids at the C-block auctions when measured in dollars per MHZ–Pop, a generally accepted industry measurement standard. (footnote omitted).

Since they were obligated to pay what turned out to be much higher prices for their licenses than other licensees, most of the winning C-block bidders, including NextWave, had difficulty securing the financing necessary for them to meet their financial commitments. They thus faced the prospect of an early default on their installment payments to the FCC.

The winning C-block bidders therefore petitioned the FCC for relief. In response, the FCC suspended the C-block installment payments and initiated an elaborate administrative process looking toward a restructuring of the C-block licensees' obligations.

On October 16, 1997, at the culmination of this process, the FCC issued a restructuring order, In The Matter Of Amendment Of The Commission's Rules Regarding Installment Payment Financing For Personal Communications Services (PCS) Licensees, Second Report And Order, FCC 97–342, 12 F.C.C.R. 16436 (Oct. 16, 1997), 1997 Wl 643811 (F.C.C.) (the "Restructuring Order"), which offered troubled C-block license holders three mutually exclusive restructuring options, ranging from amnesty—return of the licenses in exchange for forgiveness of debt obligations—to a plan that allowed bidders to keep as many of their licenses as they could pay for by converting seventy percent of their down payment into a prepayment of the full bid price of a smaller number of licenses. The FCC decided that it would be contrary to the public interest to forgive a portion of the obligations, thereby allowing bidders to keep their licenses at a significantly reduced price, because the C-block auction had been designed to ensure that licenses were allocated to users who could demonstrate, through their ability to pay the highest price,

21. *In re NextWave Personal Communications, Inc.,* 200 F.3d 43, 47–48 (2d Cir.1999).

that they possessed the most highly valued use for the licenses. [citation omitted]

In response to the oppositions, petitions and replies that it received after the release of the Restructuring Order, the FCC issued a reconsideration order on March 24, 1998. See In the Matter of Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licenses, Order on Reconsideration of the Second Report and Order, F.C.C. 98–46, 13 F.C.C.R. 8345 (Mar. 24, 1998), 1998 WL 130176 (F.C.C.) (the "Reconsideration Order"). The Reconsideration Order offered licensees slightly more flexibility in their decision-making process than the Restructuring Order, but otherwise left the Restructuring Order's framework intact. In response to still further petitions from C-block licensees, the FCC conducted yet more proceedings and issued a second reconsideration order, In the Matter of Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licenses, Second Order on Reconsideration of the Second Report and Order, F.C.C. 99–66, 14 F.C.C.R. 6571 (Apr. 5, 1999), 1999 WL 183822 (F.C.C.) (the "Second Reconsideration Order"), which essentially reaffirmed the determinations the FCC had made in its previous two orders.

The FCC, with its full weight of discretion and authority, responded to the outcry of C block licensees, by offering modifications to their installment payment plan, rather than declaring default and deeming the licenses automatically canceled. Thus, this Court must conclude that the Licenses do not automatically cancel unless the FCC decides to utilize that remedy. And, since cancellation does not occur without the FCC's exercise of choice, discretion and authority, § 362(a)(3) applies. Cancellation of the Licenses is an act to exercise control over property of the estate. It is an act that is stayed.

### Cancellation of the Licenses is not a regulatory act excepted from the Automatic Stay under § 362(b)(4).

Having determined that the FCC's cancellation is an act within the scope of the stay under § 362(a)(3), the Court turns to the question of whether the FCC's action is excepted from the automatic stay, as a regulatory action under § 362(b)(4). This section states in pertinent part, that the filing of a bankruptcy petition does not operate as a stay of "the commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's ... police or regulatory power." [22]

At the outset, this Court emphasizes that although there are a number of decisions addressing the applicability of the regulatory exception under § 362(b)(4), the only published decisions on point are the NextWave decisions, which involve another C block licensee that filed a Chapter 11 bankruptcy. After the bankruptcy court in NextWave issued several opinions,[23] which inter alia, granted the debtor's complaint against the FCC under § 548[24] and denied the FCC's motion for relief from stay, the Second Circuit Court of Appeals issued an opinion reversing the bankruptcy court, holding that the bankruptcy court lacked jurisdiction to avoid the FCC's transfer of the licenses to the debtor. On remand, the bankruptcy court held[25] that § 362(b)(4) did not apply, because in canceling the licenses, the FCC was acting

---

22. § 362(b)(4).

23. In re NextWave Personal Communications, Inc., 235 B.R. 314 (Bankr.S.D.N.Y.1999); In re NextWave Personal Communications, Inc., 235 B.R. 314 (Bankr.S.D.N.Y.1999).

24. Section 548 authorizes a trustee to avoid fraudulent transfers and obligations.

25. In re NextWave Personal Communications, Inc., 244 B.R. 253 (Bankr.S.D.N.Y.2000).

primarily to protect its pecuniary interest, and thus the FCC was stayed from canceling the licenses. The Second Circuit then granted a petition for mandamus and reversed the bankruptcy court,[26] holding that the licenses were automatically canceled and that the bankruptcy court was without jurisdiction to consider the application of § 362. As discussed in the *Preemption* section of this opinion, *infra*, this Court declines to follow the Second Circuit's decision.

Although the *NextWave* decisions are the only reported decisions on point,[27] there is a legion of cases that involve actions by regulatory agencies that revoke, withdraw, or limit a debtor's rights or use of property, or assess fines and penalties, based on the debtor's failure to comply with certain laws or regulations. In none of these cases, though, did the regulatory agency take action against the debtor or property of the estate, solely because the debtor was delinquent, or in default on payments due under a note to the regulatory agency.

■■■■■ All actions by a regulatory agency are not per se excepted from the automatic stay by § 362(b)(4). As the Tenth Circuit Court of Appeals stated in the *Eddleman*[28] case:

> Of course, not every agency action against a debtor can be characterized as one that enforces "police or regulatory power." Consequently, courts have developed two tests for determining

whether agency actions fit within the exception. Under the "pecuniary purpose" test, the court asks whether the government's proceeding relates primarily to the protection of the government's pecuniary interest in the debtor's property and not to matters of public policy. [citations omitted] If it is evident that a governmental action is primarily for the purpose of protecting a pecuniary interest, then the action should not be excepted from the stay. In contrast, the "public policy" test distinguishes between government proceedings aimed at effectuating public policy and those aimed at adjudicating private rights.[29]

■■■ A review of some of the cases applying § 362(b)(4) is instructive. What constitutes regulatory action, as opposed to pecuniary action, is sometimes clear. For example, in the *Commerce Oil*[30] decision, the regulatory agency imposed a fine and penalties against a debtor for discharges in violation of the Tennessee Water Quality Control Act. This governmental action was clearly regulatory in purpose, not pecuniary. Imposition of fines and penalties was not for Tennessee's pecuniary advantage. Rather, Tennessee was trying to protect the health and safety of its citizens by enforcing the law on clean water.

■■■ Similarly, in the *Commonwealth Companies*[31] case, the government had no pecuniary purpose in suing the debtor

**26.** In *In re F.C.C.*, 217 F.3d 125 (2d Cir.2000), petition for cert. filed, 68 USLW 3774 (June 9, 2000)(No. 99–1980).

**27.** As previously noted, the bankruptcy court decision in *In re Personal Communications Network, Inc.*, 249 B.R. 233 (Bankr.E.D.N.Y. 2000) is distinguishable, because the grace period expired before the licensee filed bankruptcy. And, that court was bound by the Second Circuit's opinion that the bankruptcy court lacked jurisdiction to consider the application of the stay.

**28.** *Eddleman v. United States Dep't of Labor*, 923 F.2d 782, 791 (10th Cir.1991), *overruled*

in part on grounds unrelated to this case by *Temex Energy, Inc. v. Underwood, Wilson, Berry, Stein & Johnson*, 968 F.2d 1003 (10th Cir.1992)(dealing with finality of bankruptcy orders).

**29.** Id. At 791.

**30.** *Word v. Commerce Oil Company (In re Commerce Oil Company)*, 847 F.2d 291 (6th Cir.1988).

**31.** *United States v. Commonwealth Companies (In re Commonwealth Companies)*, 913 F.2d 518 (8th Cir.1990).

under the False Claims Act for damages caused by the debtor's bid-rigging a government contract. Rather, the governmental action was to effectuate public policy, by deterring fraud against the government.

But when the government wears two hats, as in the case at bar, of regulator and creditor, courts have had to determine which hat the government is wearing in connection with the conduct at issue. In *Eddleman*,[32] the Tenth Circuit applied the pecuniary purpose and public policy tests, and concluded that the government's conduct was not pecuniary. There the Department of Labor sued the debtor under the Service Contract Act to liquidate claims for back wages and to debar the debtors from participation in government contracts. The statute required all federal government contractors to pay certain minimum wages and fringe benefits. The court found that the agency's action was to effectuate the policies of the Service Contract Act, not to obtain some pecuniary advantage for the government.

In the *Yellow Cab* case,[33] the Tenth Circuit concluded that the Colorado Public Utilities Commission's conduct was regulatory, grounded in public policy. There the agency denied the debtor's application to transfer certificates authorizing the operation of 600 taxicabs, because the debtor had never operated more than 300 cabs, despite having authority to operate 600. The agency's action was not to protect any pecuniary interest, but to avoid the destructive consequences to other taxicab operators from the sudden allowance of an additional 300 cabs in the Denver area.

In the *Universal Life*[34] case, the court had to determine whether the IRS's revocation of the church's tax exempt status was a regulatory action under § 362(b)(4). The court reasoned that while the IRS's determination would have financial consequences to the debtor, that does not determine whether the agency acts with a pecuniary purpose. The court concluded that this was a regulatory action to effectuate the public policy of allowing tax exempt status only to qualifying entities. The court distinguished that type of action from an action to assess or collect taxes from the church, which would be pecuniary, and an adjudication of a private right.

In the *Corporacion*[35] case, however, the court determined that the primary purpose of the government action was to protect its pecuniary interest. There, the Department of Health for the Commonwealth of Puerto Rico filed an action to declare the debtor hospital in default and to rescind its contract with the debtor. This action was precipitated by an audit of the debtor's performance and compliance with the contract. The court concluded that an action to enforce contractual rights is not excepted under § 362(b)(4), because it does not involve the agency's enforcement of police or regulatory power.

In the case at bar, not only is the FCC attempting to enforce its contractual rights under its Notes and Security Agreements, but the only right it is seeking to enforce is the right to full and timely payment of installments. That is the FCC's only basis for the so-called automatic cancellation of the licenses. In this case, the FCC's primary purpose is to

**32.** *Eddleman v. United States Dep't of Labor,* 923 F.2d 782, 791 (10th Cir.1991), *overruled in part on grounds unrelated to this case by Temex Energy, Inc. v. Underwood, Wilson, Berry, Stein & Johnson,* 968 F.2d 1003 (10th Cir.1992)(dealing with finality of bankruptcy orders).

**33.** *Yellow Cab Coop Ass'n v. Metro Taxi, Inc. (In re Yellow Cab Coop. Ass'n),* 132 F.3d 591 (10th Cir.1997).

**34.** *Universal Life Church, Inc. v. United States (In re Universal Life Church, Inc.),* 128 F.3d 1294 (9th Cir.1997).

**35.** *Corporacion de Servicios Medicos Hospitalanos de Fajardo v. Mora (In re Corporacion de Servicios Medicos Hospitalanos de Fajardo),* 805 F.2d 440, 445 (1st Cir.1986).

protect its pecuniary interests, to be paid under the terms of the notes.

The FCC's attempted cancellation of the licenses is not primarily to effectuate public policy. The statute and regulations define the public policy, stressing that the goal and purpose of allocating the spectrum was to allow for the efficient use of the broadband spectrum. To that end, one of the contractual conditions was a two-year build out requirement, necessitating that the licensees be ready to use the allocated licenses within two years. Clearly, this build out requirement is to effect the purpose of efficient and expedient use of the broadband spectrum, for the benefit of the public.

The requirement that the licensees make a down payment at the time the license is granted could serve to demonstrate the licensee's financial ability to comply with the build out requirements. A licensee's inability to make the down payment would strongly suggest that it does not have the resources to satisfy the two-year build out requirement. But, once a licensee begins making installment payments and begins the build out process, its failure to make a timely payment of a subsequent installment does not necessarily demonstrate that it cannot complete the build out. If, for example, a licensee allocated its finances to complete the build out within the two years and in so doing was unable to fully or timely make an installment payment, the FCC's public policy would nevertheless be effectuated, for the licensee would be striving to begin using the spectrum within the two-year period. Of course, this would be at a cost. The FCC's pecuniary interest, in getting paid under its notes, would be adversely impacted.

The problem with the FCC's argument is that it assumes that a missed or untimely payment equates with a total inability to develop, use and sell services. It does not. While a missed or late payment may indicate a cash flow problem, or be an indicator of a number of economic and financial problems, it does not necessarily indicate that the licensee cannot use the spectrum for the benefit of the public. Nor does it indicate that the licensee is inoperative or incapable of operations. This is particularly so when the licensee files a Chapter 11 case, and seeks to propose a plan of reorganization. In that case, the licensee's delinquency in payments does not necessarily translate into a cessation of operations.

When the FCC made decisions about how to allocate the Licenses, such as when it determined to use market forces via an auction, those were regulatory decisions, with a purpose to provide a public benefit. The FCC went to great lengths to design and implement an auction that would allow for efficient and effective allocation of the spectrum, using market forces to accomplish its aim. In so doing, the FCC had other policies it sought to honor, including diversifying the group of licensees to include small businesses and entrepreneurs. Clearly in these respects, the FCC was effectuating public policy. At the same time, the FCC wanted to insure that the licensees were capable of performance and that they could pay for the licenses. The FCC required two up-front payments, 10 percent at the time of the conditional award of the license and 10 percent at the time of the grant of the license. These payments served to demonstrate the licensee's financial ability. However, when the FCC makes a specific determination of how to deal with a licensee's default under the note and security agreement, it is no longer operating in the public policy sphere. It has crossed into the sphere of adjudication of private rights.

### Preemption.

The Court is compelled to address another argument, made by the FCC implicitly, and discussed more directly in the Second Circuit's *NextWave* opinions.[36]

**36.** *In re NextWave Personal Communications,* *Inc.,* 200 F.3d 43 (2nd Cir.1999); *In re F.C.C.,*

Does the Federal Communications Act, and its enabling regulations, preempt the Bankruptcy Code and divest the bankruptcy court of jurisdiction to interpret the scope of the automatic stay and to apply the stay to the FCC?

In its first *NextWave*[37] decision, the Second Circuit held that the FCC has exclusive jurisdiction to place conditions on the use of a license and to revoke the license, and that the bankruptcy and district courts are without jurisdiction to review the FCC's decision. The opinion did not address the effect of the automatic stay on the FCC's action in revoking a license postpetition. After the case was remanded to the bankruptcy court, that court ruled[38] that the FCC's declaration that the licenses were automatically canceled upon expiration of the grace period, was an action that violated the automatic stay, and that the exception for regulatory action under § 362(b)(4) did not apply.

The Second Circuit subsequently granted a petition for mandamus and held[39] that the automatic stay did not preclude the FCC from enforcing its regulatory power by canceling the licenses for debtor's failure to make a payment. The court did not analyze or explain its reasoning that the automatic stay did not apply. Its decision was grounded in the proposition that the bankruptcy court had no jurisdiction to question the FCC's regulatory conduct. In effect, the court ruled that a bankruptcy court has no jurisdiction to determine whether the FCC's action is within the scope of the automatic stay and/or one of the exceptions to the automatic stay. If the FCC contends that its action is regulatory, apparently the bankruptcy court must accept that assurance at face value and lacks authority to determine whether the Bankruptcy Code has any relevance or impact on the relationship between the FCC and the debtor.

This Court is not bound by the Second Circuit's decision and respectfully disagrees. To say that the bankruptcy court has no jurisdiction to determine whether a governmental entity's conduct is within the scope of the automatic stay is fundamentally wrong. In fact, bankruptcy courts have core jurisdiction over such questions.[40] To say that the bankruptcy court must accept the FCC's position without question, is to render § 362 meaningless. Although not expressly stated, the opinion could be read as a pronouncement that the Federal Communications Act preempts the Bankruptcy Code. The Federal Communications Act does not preempt the Bankruptcy Code with respect to debtor-creditor issues in bankruptcy. The FCC argues that the regulations state that nothing shall be construed to limit the FCC's power to allocate and oversee licenses. The language the FCC refers to is found in the Rules of Construction section of the statute, which states in pertinent part:

(6) Rules of construction

**Nothing in this subsection, or in the use of competitive bidding, shall—**

    . . . .

(C) diminish the authority of the Commission **under the other provisions of this chapter** to regulate or reclaim spectrum licenses;

    . . . .

217 F.3d 125 (2d Cir.2000) *petition for cert. filed,* 68 USLW 3774 (June 9, 2000) (No. 99–1980).

**37.** *In re NextWave Personal Communications, Inc.,* 200 F.3d 43, 54 (2nd Cir.1999).

**38.** *In re NextWave Personal Communications Network, Inc.,* 244 B.R. 253 (Bankr.S.D.N.Y. 2000).

**39.** In *In re F.C.C.,* 217 F.3d 125 (2d Cir.2000), *petition for cert. filed,* 68 USLW 3774 (June 9, 2000)(No. 99–1980).

**40.** 28 U.S.C. § 157(b)(2)(G).

(H) be construed to relieve any applicant for a license or permit of the obligation to pay charges imposed pursuant to section 158 of this title.[41] (emphasis added).

This language merely provides that nothing else within the Federal Communications Act shall be read to diminish the FCC's authority to regulate or reclaim the licenses.

■ To be sure, this Court is without jurisdiction to examine or question the validity of the FCC's regulations or the legitimacy of the FCC's conduct. This rule of law applies not only to the FCC, but to other regulatory agencies.[42] There is a distinction, however, between questioning the validity of the FCC's regulations or conduct, and determining whether the FCC's conduct is within the scope of the automatic stay. In fact, courts routinely determine whether the stay applies, and if so, whether one of the exceptions to the stay applies. Those determinations were made by the Tenth Circuit in the *Yellow Cab* and *Eddleman* decisions, as well as in a host of other cases cited in this opinion. The Second Circuit's decision fails to recognize this critical distinction.

The Second Circuit's *NextWave* decisions effectively tie the hands of the bankruptcy and district courts from exercising their exclusive jurisdiction to interpret and apply the provisions of the Bankruptcy Code. These decisions are unprecedented and without merit. This Court must follow the line of reasoning in the *Eddleman* and *Yellow Cab* decisions, which allows the bankruptcy court to first determine whether the stay applies under § 362(a), and if so, whether there is an applicable excep-

tion to the stay under § 362(b). In so doing, this Court concludes that the FCC's attempted cancellation of the licenses is stayed under § 362(a)(3) and not excepted from the stay by § 362(b)(4).

■ The estate takes this property interest, the Licenses, subject to all of the conditions and limitations applicable to the debtor's interest in the property. The debtor's interest in the Licenses is a "limited interest encumbered by conditions that the [licensing agency] imposed in its regulations."[43] It is important to note that the Bankruptcy Code does not excuse or modify KPCS's nonmonetary obligations to the FCC, pursuant to the terms of the regulations and licenses. However, with respect to the requirement that it timely and fully pay the installment payments, the Bankruptcy Code allows the Chapter 11 debtor to "impair" a claim under a Chapter 11 plan. A plan impairs a claim, as defined under § 1124(2) when under the plan,

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of the kind specified in section 365(b)(2) of this title;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable

---

**41.** 47 U.S.C. 309(j)(6).

**42.** *MCorp Financial, Inc.,* 502 U.S. 32, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991).

**43.** *Federal Aviation Administration v. Gull Air, Inc. (In re Gull Air, Inc.),* 890 F.2d 1255, 1260 (1st Cir.1989)(debtor's proprietary interest in airport landing slots issued by FAA held subject to use conditions established by FAA reg-

ulations). *See also In re FCX, Inc.,* 853 F.2d 1149, 1153 (4th Cir.1988), *cert. denied, Universal Cooperatives, Inc. v. FCX, Inc.,* 489 U.S. 1011, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989)(once a property interest has passed to the estate, it is subject to the same limitations imposed upon the debtor by applicable non-bankruptcy law); *In re Schauer,* 835 F.2d 1222, 1225 (8th Cir.1987).

reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.[44]

Thus, the Bankruptcy Code allows the debtor to decelerate an accelerated claim and cure a default. A Chapter 11 debtor is also allowed to modify the rights of holders of secured claims. KPCS may, in the context of a confirmed Chapter 11 plan, modify its payment obligations to the FCC.[45]

## CONCLUSION

For the reasons stated above, the Court concludes that the Licenses were property of the bankruptcy estate on the date of filing, and that the Licenses remain property of the bankruptcy estate. The FCC's "automatic cancellation" of the Licenses was stayed by the filing of the bankruptcy under § 362(a)(3). Cancellation, based solely on the debtor's failure to make a timely installment payment, is an action to protect the pecuniary interests of the FCC under its notes and security agreements, not an action to effectuate its public policy, and is not excepted from the stay under § 362(b)(4). Finally, nothing in the Federal Communications Act or its enabling regulations preempts the Bankruptcy Code's province over debtor-creditor issues in bankruptcy. The bankruptcy court has jurisdiction to determine whether the FCC's action is stayed under the provisions of 11 U.S.C. § 362.

**IT IS THEREFORE ORDERED BY THE COURT** that the FCC's Motion for Amendment of Schedules and Statement of Financial Affairs and to Strike References to PCS Licenses is DENIED.

44. § 1124(2).

45. The FCC's reliance on *Trigg v. United States*, 630 F.2d 1370 (10th Cir.1980) is mis-

This Memorandum shall constitute findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by Rule 9021 of the Federal Rules of Bankruptcy Procedure and Rule 58 of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED.**

placed. That case discusses the duty of a lessee to make an annual payment and the applicable law was The Bankruptcy Act of 1898, not the present Bankruptcy Code.